IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02362-REB-KLM

RAYMOND MONTOYA,

      Plaintiff,

v.

BRUCE NEWMAN, in his official capacity as the Sheriff of Huerfano County Jail,
LARRY GARBISO,
DOE #1, 2 - detention center officer at Huerfano County Jail,
DOE #1-2, medical staff member at Huerfano County Jail, and
CHARLES NEECE, M.D.,

      Defendants.

_____

## ORDER
_____

## ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX

This matter is before the Court on **Plaintiff's oral Motion for Spoliation Sanctions**

[#86][1] (the "Motion"). A hearing was held on the Motion on May 13, 2014 [##87, 99] and

June 3, 2014 [##102, 103]. The Court has reviewed the entire case file and the applicable

law and is sufficiently advised in the premises. For the reasons set forth below, the Motion

[#86] is **granted in part** and **denied in part.**

### I. Factual Background and Procedural History

This case involves Plaintiff's allegations that he contracted "a grave illness that

almost killed him" as a result of his incarceration at the Huerfano County Jail, "a facility

_____

[1] "[#86]" is an example of the convention I use to identify the docket number assigned to
a specific paper by the Court's case management and electronic case filing system (CM/ECF). I
use this convention throughout this Order.

known to harbor dangerous disease [sic] that regularly afflicted inmates." *Sched. Order* [#25] § 3(a).  The facts and events related to the lawsuit and the spoliation dispute are explained below.

The northern boundary of  Huerfano County (the "County") is approximately 177 miles south of Denver, and the County's southern boundary is approximately 50 miles north of the New Mexico state line.  The County is situated along the eastern slope of the Rocky Mountains of southeastern Colorado.  Huerfano County Colorado, http://www.usacitiesonline.com/cohuerfanocounty.htm (last visited July 6, 2015).  As of the 2010 census, the population of the County was approximately 6,700.  Huerfano County, Colorado, WIKIPEDIA, https://en.wikipedia.org/wiki/Huerfano_County,_Colorado (Last visited July 6, 2015).  The County seat is located in the town of Walsenburg, which is also the home of the Huerfano County Jail (the "Jail").  *Id.* (noting that "[t[he county seat is Walsenberg."); Huerfano County Sheriff's Office, http://www.huerfano.us/sheriff.php (last visited July 6, 2015).  Defendant Bruce Newman is the Sheriff of Huerfano County. He was first elected to the position approximately eleven years ago. *See May 13, 2014 Hearing Transcript* [#99] at 67:12.  Sheriff Newman oversees the Jail.  *See, generally, County Defendants' Submission of Exhibits For May 13, 2014 Hearing*, Exh. A-2[2] (the "Garbiso Depo.") at 16:22-24.

---

[2]  The parties submitted documents to the Court via email in advance of the May 13, 2014 hearing.  Plaintiff's exhibits were identified numerically.  The Court refers to these documents as "Plaintiff's Exh. __."  Defendants' exhibits were attached to the County Defendants' Submission of Exhibits for May 13, 2014 Hearing and the County Defendants' Submission of Cross-Designation of Exhibits For May 13, 2014 Hearing.  Defendants' exhibits are labeled"A-__."  To the extent certain exhibits were attached to later documents filed on the docket, the Court refers to them by citing to the docket number.

In March of 2001, before Sheriff Newman's service began, the American Civil Liberties Union ("ACLU") wrote a letter to the County health department on behalf of seven inmates who complained about improper ventilation at the Jail, among other issues. *See generally Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Defendant's Spoliation of Evidence* ("Plaintiff's Proposed Facts"), Exh. 2 [#113-2]. The letter asserted that the inmates had breathing problems and headaches, and the ACLU urged the County health department to conduct an inspection of the facility. *Id.*

The record does not reveal whether the Jail was inspected after the County health department received the ACLU's letter. Several years later, in March of 2009, an inmate at the Jail wrote another letter to the health department requesting an inspection of the Jail regarding "mold and air quality." The letter stated that "mold . . . is especially bad in D-pod although all pods do have mold d-pod is by far the worst case of all." *Plaintiff's Proposed Facts*, Exh. 3 [#113-3] at 3-4. According to a letter from the health department to the County Commissioners and the Sheriff, the Jail was inspected later that month and mold was found in "the entire area of D-pod, which is approximately 1800 square feet," as well as in C-pod and the shower mat in the women's pod. *Id.* at 1-2. The inspection concluded that "the existing moisture in the building is due to a failed ventilation system that exacerbates the mold problem." *Id.* at 1. The letter recounts that "a sheriff's deputy" reported that the ventilation system had been broken for at least the past eleven years. *Id.* at 2. The inspectors "strongly suspect[ed] the possibility of hidden mold in the heating and venting system" of the Jail. *Id.* They noted that "jail personnel" reported that inmates frequently requested pain medication, "which may indicate some health and respiratory problems caused from breathing in mold and musty, used air." *Id.* The letter suggested

repair of the ventilation system and subsequent cleaning, to be conducted after prisoners were removed from the moldy areas. *Id.*

The record does not contain information about whether the Jail's ventilation system was repaired as a result of the March 2009 inspection or whether any cleaning occurred at that time. The record reflects, however, that some cleaning occurred "in late 2010 and early 2011." *Plaintiff's Exh. 9* at 3. The 2010/2011 cleaning may have been prompted by an August 4, 2010 letter to Defendant Larry Garbiso, who was then the Jail Administrator, from eleven members of the Jail Detention Staff. *Garbiso Depo.* at 15:19-23; *see generally Plaintiff's Exh. 14* (August 4, 2010 Letter to Larry Garbiso). The letter states in part as follows:

> "Another issue that concerns us is the health risks from the black mold that is growing in the cells. A few months ago we read in the Huerfano World that this problem was solved.[3] We're telling you now that the mold is still growing on the walls. We see this problem every day. Everytime [sic] it rains or snows the ceiling leaks in the control center and all over the jail. We are asking to bring in a team of health inspectors to check out this potential health problem. Another concern is inmates going to the Dr. with staff [sic] infections, mainly (MURSA) [sic]. This is highly contagious, and we have seen numerous cases."

*Plaintiff's Exh. 14.*

According to the Sheriff, "when we did the cleaning [in 2010/2011], we did have a big mess. A lot of files were put in boxes; boxes were shifted around." *Plaintiff's Exh. 4* ("March 11, 2014 Newman Depo.") at 42:21-23. As discussed in more detail below, at some point after the cleaning the Sheriff had several boxes of documents shredded. *Id.*

---

[3] This statement suggests that a previous cleaning had occurred and that the local newspaper reported that the mold had been removed, but the parties have provided no further evidence on this point.

at 42:25-43:1.

Plaintiff, Raymond Montoya, was apparently a frequent resident of the Jail during some part of the time period at issue in the Motion.  *See, e.g., Plaintiff's Exh. 13* ("Bumgarner Depo.") at 131: 23-25; 134:9-13 (Detention Officer Jennifer Bumgarner testified in her deposition as follows: "[Mr. Montoya] was in there on several occasions, yes. . . . The two inmates I saw with MRSA, they were another – in and out quite a bit type of deal – like – like Raymond Montoya.").  Mr. Montoya's lawsuit stems from his incarceration at the Jail in early March of 2011.  *Plaintiff's Exh. 1* ("Montoya Depo.")[4] at 54:25-55:2.[5]   A former Detention Officer admits that Mr. Montoya had told her "at least two or three times" before his incarceration in early 2011 that he was prone to MRSA.[6]  *County Defendants' Submission of Cross-Designation of Exhibits For May 13, 2014 Hearing, Exh. A-14* at 194:22-195:2. Mr. Montoya alleges that during that seven-day incarceration, he submitted two or three "kites" (forms by which prisoners request medical attention) which requested that he be allowed "to see a doctor because I didn't feel good, and it was getting worse, my

---

[4] Defendants designated other portions of this deposition at Defendants' Exh. A-8.  The Court refers to the Montoya Deposition transcript as if it was submitted as one document.

[5]  The Scheduling Order states that the incarceration which resulted in Mr. Montoya's medical problems occurred in March of 2010.  *Sched. Order* [#25] § 3(a). However, both the Complaint and the Amended Complaint refer to March of 2011.  *Complaint for Damages - Jury Trial Demanded* [#3] ¶¶ 1-2; *Amended Complaint for Damages - Jury Trial Demanded* [#7] ("Amended Complaint") ¶¶ 1-2. The Court assumes that the date in the Scheduling Order is an error.

[6] "MRSA, or methicillin-resistant staphylococcus aureus, is a strain of staph bacteria that has become resistant to the anitbiotics commonly used to treat ordinary staph infections.  These infections generally start as small red bumps that resemble pimples, boils or spider bites but can quickly turn into deep, painful abscesses that require surgical draining.  Sometimes the bacteria remain confined to the skin.  But they can also burrow deep into the body, causing potentially life-threatening infections in bones, joints, surgical wounds, the bloodstream, heart valves and lungs."  M R S A    I n f e c t i o n ,   M A Y O   C L I N I C , http://www.mayoclinic.org/diseases-conditions/mrsa/basics/definition/con-20024479 (last visited July 6, 2015).

symptoms were getting worse, and I requested to see a doctor or be taken to the hospital."
*See, e.g., Plaintiff's Exh. 10* (Huerfano County Jail Inmate Request Form); *Montoya Depo.*
at 54:25-55:8.  Plaintiff alleges that his symptoms included urine in his blood, coughing,
sore throat, vomiting, heavy sweating, fever and headache.  *Montoya Depo.* at 138:16-
142:3.[7]  He alleges that "jail guards, supervisors, medical and other staff members largely
ignored [his] requests for medical care" and that he was "given only ibuprofen."  *Sched.*
*Order* [#25] § 3(a).  He asserts that when he was being transported out of the Jail on March
10, 2011, "a transport officer recognized that [he] was in dire need of medical help."  Mr.
Montoya was taken to a hospital "on the brink of death" and diagnosed with MRSA,
pneumonia, acute respiratory failure and severe sepsis.  *Id.*  He was subsequently airlifted
to another hospital's intensive care unit and received treatment for two weeks at a cost of
approximately $270,000.  *Id.*

The parties dispute many of the facts about Mr. Montoya's incarceration and illness.
One apparent record of Mr. Montoya's stay at the Jail in March of 2011 was created by
Detention Officer Bumgarner, who completed an Incident in Jail form which reads as
follows:

> "On March 3, 2011 So 2[8] had brought in Montoya, Raymond into the
> Huerfano County Jail on a warrant.  Montoya, Raymond had called into the
> bubble a day later and said that he needed a cold tab and an ibu.  Montoya,
> Raymond had received the medicine for a few days, every time he called in
> for it.  A couple of days later Montoya, Raymond asked for a kite to see the

---

[7]  The record contains various testimony that MRSA causes visible sores on the skin which
frequently split. *See, e.g., Bumgarner Depo.* at 135:19-23; *Plaintiff's Exh. 34* ("Montez Depo.") at
53:7-25 ("It grows, like, into the skin, or into the meat, you know. . . .[I]t drains. You got to squeeze
it forever, and it leaks out, and it is disgusting, brown. It stinks.  You smell odor from it.")

[8]  The meaning of "So 2" is not explained in the record relating to the Motion.  The Court
assumes the phrase refers to a particular Sheriff's department employee.

6

Doctor he said he was sick and that he was prone to mrsa kite was given. Dr. Neece was called to see Montoya, Raymond. Dr. Neece came in to see Montoya, Raymond around the 8th of March 2011 at that time Dr. Neece said he would need medicine and that he would call it in, he did.  Dr. Neece never said what the medicine was for.  On March 10, 2011 Montoya's meds were picked up.  That same day Montoya was released to San Luis Valley the medication was released with Montoya."[9]

*Plaintiff's Proposed Facts, Exh. 27* [#113-4] at 1.

Not surprisingly, the parties disagree about whether Mr. Montoya requested, was given and completed more than one kite during his March 2011 incarceration, whether he made any verbal requests to see a doctor, whether Jail staff would have allowed him to see a doctor based on only verbal requests, how sick he was during his incarceration,  whether he contracted MRSA from exposure to the conditions at the Jail, whether he had MRSA when he arrived at the Jail and it was exacerbated by conditions at the Jail and/or lack of appropriate medical attention, and whether Dr. Neece properly evaluated  Mr. Montoya. Nevertheless, certain facts relating to the spoliation issue are undisputed.

First, the parties agree that Jail inmates frequently submitted "kites" seeking medical attention, and that some inmates who were incarcerated prior to March of 2011 showed symptoms of MRSA or asserted that they had MRSA while in the Jail.  *See, generally, Bumberner Depo.* at 196:13-18; *Plaintiff's Exh. 14* (August 4, 2010 Letter to Larry Garbiso). They also agree that if Mr. Montoya submitted a kite or kites while incarcerated in early March of 2011, the Sheriff has been unable to locate them.  *Plaintiff's Exh. 3* ("June 13, 2013 Newman Depo.") at 39:8-10.  Finally, they agree that the Sheriff has been unable to

---

[9]  The punctuation and grammar used in the original document are reproduced here.  The nature of the summary and the author's use of the past tense suggest that the incident report was created some time after Mr. Montoya's release from the Jail on March 10, 2011, but the parties provide no further evidence explaining when the document was created.

locate all but a few kites submitted by inmates at the Jail in 2010 and 2011, and the Sheriff believes the remainder of any inmate kites from those years were probably destroyed. *Plaintiff's Exh. 9* at p. 3.

Plaintiff asserts that the Sheriff deliberately shredded inmate kites and other medical records in an attempt to avoid disclosure of damaging evidence. Defendants Newman and Garbiso (the "County Defendants") assert that any destruction of inmate kites was inadvertent. The Court conducted a hearing on the Motion on May 13, 2014 [##87, 99] and June 3, 2014 [##102, 103]. Certain exhibits were admitted into evidence on the latter date. *See generally Courtroom Minutes/Minute Order* [#102]. At the conclusion of the second day of hearing, the Court ordered counsel to submit proposed Findings of Fact and Conclusions of Law by a specified date. *Id.* at 4. The parties filed their proposed Findings of Fact and Conclusions of Law in late June of 2014 [##112, 113]. On July 7, 2014, the County Defendants filed a motion to strike the exhibits to Plaintiff's Proposed Findings of Fact and Conclusions of Law [#114]. That motion was granted in part and denied in part by the Court on December 15, 2014. *See generally Order* [#121] (the "December Order"). In compliance with the December Order, the County Defendants filed their Amended Proposed Findings of Fact and Conclusions of Law [#123] and Plaintiff filed his Supplement to Proposed Findings of Fact and Conclusions of Law Regarding Defendant's [sic] Spoliation of Evidence [#124] ("Plaintiff's Supplement"). The County Defendants then filed a motion to strike Plaintiff's Supplement on the grounds that "Plaintiff provided new and, in some cases, previously undisclosed exhibits with" Plaintiff's Supplement. *Motion* [#125] at 2. That motion was also granted in part and denied in part on March 4, 2015. *See Order* [#129] at 6.

As a result of this somewhat protracted procedural history, the Court has received and reviewed the following written information in connection with the Motion:

(1)     Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Defendant's [sic] Spoliation of Evidence [#113];

(2)     Plaintiff's Supplement to Proposed Findings of Fact and Conclusions of Law Regarding Defendant's [sic] Spoliation of Evidence [#124];

(3)     Plaintiff's Exhibits 1 through 36(b);

(4)     County Defendants' Opposition to Plaintiff's Motion for Sanctions for Spoliation of Evidence ("Defendants' Opposition") [#111];

(5)     County Defendants' Proposed Findings of Fact and Conclusions of Law [#112];

(6)     County Defendants' Amended Proposed Findings of Fact and Conclusions of Law [#123]; and

(7)     County Defendants' Exhibits A-1 through A-32 and A-34 through A-37.

## II. Analysis

"Destruction of evidence, or spoliation, is a discovery offense . . . ." *Gates Rubber Co. v. Bando Chem. Indus. Ltd.,* 167 F.R.D. 90, 101 (D. Colo. 1996).  To ensure that discovery as permitted under the Federal Rules of Civil Procedure is not rendered futile, "litigants have a duty to preserve documents that may be relevant to pending or imminent litigation." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614, 620 (D. Colo. 2007).  The Court may impose sanctions for destruction or loss of evidence. *Id.* "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because [he] knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co.,* 470 F.3d 985, 989 (10th Cir. 2006)).  The movant has the burden of proving, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it. *In re Krause*, 367 B.R. 740, 764 (D. Kan. 2007); *see also Oldenkamp v. United Am. Ins. Co.,* 619

9

F.3d 1243, 1251 (10th Cir. 2010).[10]

## A.    Duty to Preserve Evidence

A party is under a duty to preserve evidence when litigation is imminent. *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007).  As an initial matter, the Court addresses the County Defendants' argument that because Plaintiff did not give notice of and has not pled a *Monell* claim alleging that the County had a pattern, practice or policy of delaying or denying treatment to inmates at the jail, the Sheriff had no obligation to preserve other inmate kites relating to requests for medical treatment. "Given the statements in the notice of claim and initial and amended complaints, these were insufficient to put Sheriff Newman on notice to preserve kites submitted by other inmates." *County Defendants' Opposition to Plaintiff's Motion for Sanctions for Spoliation of Evidence* [#111] ("Defendants' Opposition") at 32-33.  This argument is unavailing.

First, before filing suit Plaintiff provided notice of his claims to Defendant Newman under the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. § 24-10-109. The CGIA requires that the notice include "a concise statement of the factual basis of the claim, including the date, time, place and circumstances of the act, omission, or event complained of."  *Id.* at (2)(b).  Plaintiff's notice in this case stated that he was diagnosed with MRSA after leaving the Jail and that "there is a history of illness arising from the

---

[10]   The proposed change to Fed. R. Civ. P. 37(e) delineating a multi-part test for imposition of spoliation sanctions relating to electronic evidence is under consideration by Congress and has not yet been adopted.  *See* Steven S. Gensler, 1 Fed. R. Civ. P., Rules & Commentary Rule 37 ("Proposed amendments to Rule 37(e) are working their way through the rulemaking process and, if they complete the journey, will take effect on December 1, 2015.  These amendments would effectively repeal the existing version of Rule 37(e) and replace it with a greatly expanded version that, among other things, would limit severe spoliation sanctions to cases where the spoliator 'acted with the intent to deprive another party of the information's use in the litigation.'").

conditions of the Huerfano County Jail.  In light of that history, the conditions of the jail itself, and Mr. Montoya's requests for care, the jail detention and medical staff were aware that Mr. Montoya's condition could have been caused by the jail conditions and could have been serious." *Plaintiff's Exh. 2* at 3 (page 2 of August 31, 2011 letter to Defendant Newman).  The reference to "a history of illness arising from the conditions" of the Jail should have put a reasonable reader on notice that Mr. Montoya was contending that his illness was not unique, there had been other similar illnesses in the past, and that the illnesses were caused by unhealthy conditions at the Jail.  Therefore, a prudent reader should have understood the significance of evidence relating to inmate illnesses similar to Mr. Montoya's.

Even if the language of the notice does not lead to the conclusion that other inmate kites would have evidentiary value in adjudication of Mr. Montoya's claim, the CGIA does not require a claimant to provide notice of his claim in such a way as to identify – or even suggest – relevant evidence to the recipient. For example, the CGIA has not been construed to mandate that the claimant identify the specific legal duty which forms the basis for his claim. *Neiberger v. Hawkins*,  70 F. Supp. 2d 1177, 1194 (D. Colo. 1999), *aff'd*, 6 F.App'x 683 (10th Cir. 2001), *cert. denied*, 534 U.S. 950 (2001), *reconsideration denied*, 239 F. Supp. 2d 1140 (D. Colo. 2002).  Moreover, strict compliance with the notice provision is not required; rather, a claimant satisfies the notice provision if he or she substantially complies with the statute by making a good faith effort to satisfy the notice requirements. *Villalpando v. Denver Health & Hosp. Auth.*, 181 P.3d 357 (Colo. App. 2007), *cert. denied*, No. 07SC1064, 2008 WL 921297 (Colo. April 7, 2008).  The statute has not been construed to mandate that the claimant must describe the circumstances surrounding

his claim so thoroughly as to put the recipient on notice of the specific evidence that may be relevant to the claim.  In light of the case authorities addressing good faith efforts to comply with the statute, Defendant's assertion that Mr. Montoya's notice should have alerted the Sheriff to specifically preserve other inmate kites imposes a burden neither explicit nor implicit in the law, and is therefore rejected.

Second, Defendants' argument about the lack of a *Monell* claim reflects a misunderstanding of the nature of Plaintiff's claim.  Mr. Montoya's remaining claim against the Sheriff and other County employees asserts that they were deliberately indifferent to Mr. Montoya's serious medical needs in violation of the Eighth and Fourteenth Amendments.  *Amended Complaint* [#7] ¶¶ 42-52.[11]  Mr. Montoya sued the Sheriff in his official capacity.  *Id.* ¶ 8.  "A judgment against a public servant in his official capacity imposes liability on the entity he represents. . . ."  *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985) (internal quotation marks and citations omitted); *see also Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir 1998) ("An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works.")

Local government entities, like counties, are "persons" under 42 U.S.C. § 1983, and can therefore be sued for their constitutional torts.  *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691 (1978).  A county sheriff may be held liable for the actions of county employees over whom he has the right of control.  *Seeley v. Bd. of Cnty. Comm'rs*, 791 P.2d. 696 (Colo. 1990) (citing Colo. Rev. Stat. § 30-10-506).  However, a county "can be

---

[11]  Mr. Montoya's first claim for relief, alleging that the Defendants were deliberately indifferent to the medical needs of other inmates, was dismissed for lack of standing.  *Order Adopting Recommendation of United States Magistrate Judge* [#53] at 4.

found liable under §1983 only where the [county]  itself causes the constitutional violation at issue.  Respondeat superior or vicarious liability will not attach under §1983."  *City of Canton v. Harris,* 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694-95, 698).

Counties may be held liable under §1983 only when a constitutional deprivation is inflicted pursuant to a policy or custom.  *See Monell*, 436 U.S. at 690-91, 694 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.").  An unconstitutional deprivation is caused by a municipal "policy" if it results from decisions of an official whose acts may fairly be said to be those of the municipality itself.  *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 403-04 (1997); *see also Meade v. Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988) ("For a county to be held responsible, it must have caused the harm through the execution of its own policy or custom by those whose edicts or acts may fairly be said to represent official policy." (citing *Monell*, 436 U.S. at 694)); *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996) ("To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged.").

Here, Plaintiff's official capacity claim against Sheriff Newman and other Jail staff "requires [proof of] a constitutional violation proceeding from a jail policy, custom, or practice, or from training or supervision of jail staff so inadequate as to evince a deliberate indifference to [inmates]."  *Bailey v. Kerns*, 527 F.App'x 680, 684 (10th Cir. 2013).  Hence, Defendants' argument that Plaintiff's failure to plead a *Monell* claim means that the Sheriff had no obligation to preserve inmate kites misses the point; Plaintiff's official capacity claim against the Sheriff is the equivalent of a *Monell* claim in that it may require proof of a jail

13

"policy, custom or practice."  Other inmates' kites are clearly relevant to that proof.

The Defendants' duty to preserve other inmate kites arose when Mr. Montoya's lawsuit was "imminent."  *Cache La Poudre*, 244 F.R.D. at 620.  The evidence is undisputed that Sheriff Newman received Mr. Montoya's notice of claim under the CGIA on September 2, 2011.  *Plaintiff's Exh. 2* at 1 (return receipt form for August 31, 2011 letter to Defendant Newman).  The purpose of the notice was to inform the Sheriff (and the Board of County Commissioners, to whom it was also addressed) that Mr. Montoya intended to pursue damages for his alleged injuries, and to "recognize and insure that the governing body or its attorney [was] directly involved, advised, and notified of potential litigation."  *City and Cnty. of Denver v. Crandall*, 161 P.3d 627, 632 (Colo. 2007).  The notice was "a jurisdictional prerequisite to any action" brought under the CGIA.  Colo. Rev. Stat. § 24-10-109(1).  Hence, litigation was imminent when Sheriff Newman received the notice, and his duty to preserve evidence relating to the claim arose effective September 2, 2011.

## B.    Destruction or Loss of Relevant Evidence

A court may find that spoliation has occurred when a party either negligently or intentionally fails to produce relevant evidence in litigation.  The failure may, of course, occur because evidence has been destroyed or lost.  *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1149 (10th Cir. 2009).  Plaintiff has the burden of proving that relevant evidence has been lost or destroyed by Defendants.  *Oldenkamp*, 619 F.3d at 1251.

As discussed above, Mr. Montoya's official capacity claim against Sheriff Newman requires proof that the Jail had a policy, custom or practice of deliberate indifference to inmates' serious medical needs which caused Mr. Montoya to suffer injury.  *Jenkins,* 81 F.3d at 993.  Moreover, Plaintiff must also show that (1) he was deprived of a medical need

14

that is, objectively, "sufficiently serious," and (2) Defendants knew of and disregarded "an excessive risk to [Plaintiff's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A medical need is sufficiently serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980) (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D. N.H. 1977)). Regarding the subjective component of the deliberate indifference test, "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by [the Eighth Amendment]." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Inmate kites would generally assist in proving Plaintiff's claim by (1) identifying other inmates who complained of the same or similar symptoms as Plaintiff, and (2) leading to discovery of other evidence regarding how Jail officials responded to inmate complaints of serious symptoms or illnesses during the applicable time period. These facts are critical to establishing the existence of a "policy, custom or practice" of ignoring serious medical needs at the Jail, the seriousness of any medical needs that were ignored, and whether Jail officials behaved in a manner that violated the Constitution (i.e., with "obduracy and wantonness") instead of regrettably but, nevertheless, legally (i.e., inadvertently or erroneously but in good faith.)

The fact that inmate kites pre-dating August of 2011 were likely destroyed is generally admitted. *March 11, 2014 Newman Depo.* at 45:12-23; *Plaintiff's Exh. 9* at 3. Even if they were not destroyed, it is clear that Defendants have been unable to locate them, and they are therefore lost. *June 3, 2014 Hearing Transcript* [#103] at 29:15-30:19. In the absence of an adequate explanation or substantial replacement evidence, a party's

inability to locate relevant evidence may be construed as spoliation. *See, e.g., Lutalo v. Nat'l R.R. Passenger Corp.,* No. 11-cv-00974-REB-KLM, 2013 WL 1294125 at *5 (D. Colo. Mar. 28, 2013) (holding plaintiff's loss of cell phone was spoliation justifying imposition of sanctions); *Novick v. AXA Network, LLC*, No. 07-CV-7767(AKH)(KNF), 2014 WL 5364100 at *6 (S.D.N.Y. Oct. 22, 2014) (finding that defendants spoliated audio tapes when they failed to provide any explanation for why or how the tapes came to be missing); *Victor v. Lawler*, Civil No. 3:08-cv-1374, 2012 WL 1642603 at *5 (M.D. Pa. May 10, 2012) (finding that inability to recover certain evidence was not spoliation in light of reasonable explanations for inability to recover it and existence of substantial other evidence); *Pub. Serv. Mut. Ins. Co. v. Empire Comfort Sys., Inc.* 573 F. Supp. 2d 372, 382 n.13 (D. Mass. 2008) (granting summary judgment and holding that inability of plaintiff to find heater which was the subject of breach of warranty claim was spoliation); *Puerto Rico Telephone Co., Inc. v. San Juan Cable LLC*, Civil No. 11-2315(GAG/BJM), 2013 WL 5533711 at *1 (D. P.R. Oct. 7, 2013)(finding defendant's failure to preserve, locate and produce emails was spoliation).  Plaintiff has therefore sustained his burden of showing that relevant evidence, inmate kites, were lost, destroyed, or both.

## C.    **Prejudice Resulting From Destruction of Relevant Evidence**

"The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 167 F.R.D. 90, 104 (D. Colo. 1996).  The degree of prejudice suffered by a party who experiences spoliation is generally measured in terms of how the unavailability

of the spoliated evidence affects proof of the party's claim or claims. *See, e.g., Lutalo,* 2013

WL 1294125, at *4.

In this case, Plaintiff argues that

"[t]he degree of prejudice. . . from the destruction of the documents is profound.  Defendant destroyed the most important and central documents relevant to Plaintiff's deliberate indifference claims (sic).  The only other medical documents that identified some of the inmate medical issues at the jail are Dr. Neece's progress notes.  However, the disparity between Mr. Montoya's complaints about his symptoms to Dr. Neece and the symptoms that Dr. Neece wrote down in his progress notes demonstrate that Dr. Neece's records are not a reliable source of what inmates may have told him about their symptoms and/or medical problems.  In fact, Dr. Neece claims that he has never seen a case of inmate MRSA. . . .  In sum, Dr. Neece's records cannot be used to show notice of aggravated symptoms of illness or urgent requests for medical attention communicated to jail staff sufficient to meet the subjective prong of the deliberate indifference standard . . . ."

*Plaintiff's Proposed Facts* [#113] at 23 (citing Plaintiff's Exh. 1 at 142:2-24, Defendants'

Exh. A-9, Defendants' Exh. A-1 at 82:5-8).

For their part, Defendants contend that they have "produced medical records

generated by Dr. Neece for the years 2010 and 2011.  There is no evidence to support

Plaintiff's claims that inmates contracted MRSA at the jail as a result of the jail conditions

and no reason to believe that the missing kites would provide such evidence." *Defendants'*

*Opposition* [#111] at 35 (citing Defendants' Exhs. A-12, A-9 and A-11).

Even assuming the production of medical records for inmates who were incarcerated

at the Jail in 2010 and 2011, the dearth of inmate medical kites from the applicable time

period eliminates the best possibility of telling the whole story about how Huerfano County

Jail officials responded to inmates' requests regarding illness in 2010-2011.  Without the

kites, Plaintiff has been unable to identify other inmates who complained of some or all of

the same symptoms as Plaintiff while incarcerated and to obtain their testimony about their

treatment by Jail personnel.  Although Plaintiff has located two inmates who provided information about MRSA at the Jail, *see generally Plaintiff's Exh. 28*; *Plaintiff's Exh. 29*; *Plaintiff's Exh. 34*, apparently only one of these inmates experienced illness and requested treatment while incarcerated.  *See Plaintiff's Exh. 28* ¶ 5, *Plaintiff's Exh. 34* at 10:21-24. Accordingly, the evidence relating to the Jail's treatment of sick inmates comes overwhelmingly from the named Defendants (the Sheriff, former Jail Administrator Garbiso, and Dr. Neece) and current or former Jail employees.  Like all litigants, none of these witnesses is uninterested or likely to be wholly objective.

It doesn't take much imagination to envision that the missing kites might tell a different story from Defendants' version of events.  Because the kites were generally completed by the inmates themselves, they would (at the very least) reflect the symptoms that each experienced and was able to describe on paper.  The information could lead to discoverable evidence about how both the Jail staff and Dr. Neece responded to certain types of symptoms, especially those affiliated with MRSA.  Indeed, the three former inmates whose testimony has been provided (including Mr. Montoya) all indicate that Jail staff were generally unresponsive to requests for medical treatment and the treatment provided was inadequate.  *Plaintiff's Exh. 28* ¶¶ 3-8; *Plaintiff's Exh. 29* ¶¶ 5-10; *Montoya Depo.* at 133:5-148:22.  Without the kites, Plaintiff's opportunity to establish that he had a sufficiently serious medical need and, most importantly, that Defendants knew of and disregarded an excessive risk to his health, is diminished.  As a result, his ability to prove a violation of his Constitutional rights has been prejudiced.  *Farmer,* 511 U.S. at 837.

**D.    Spoliation Sanctions**

When, as here, a party has a duty to preserve evidence which is lost or destroyed and the adverse party is prejudiced by its absence, sanctions are appropriate. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009). "If the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Id.* "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a bad case." *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997).

Plaintiff seeks entry of default judgment against Defendant Newman "on all claims," an award of reasonable attorneys' fees and costs and "an adverse inference instruction for any claims that may continue to be litigated." *Plaintiff's Proposed Facts* [#113] at 29. Defendants contend that "the breakdown in the record-keeping system is at most negligence." They assert that Plaintiff has had months of discovery to try to find evidence to support his claim "that he was exposed to MRSA while in the jail and, even if he had been, that it was due to negligence on the part of the jail." They contend that he has failed to adduce such evidence. Defendants point out that "discovery has established that the jail had only recently undergone a thorough cleaning prior to Plaintiff's incarceration." Hence, Defendants contend, "the sanctions motion is an attempt to build the case on something marginally related to the merits of the case." *Defendants' Opposition* [#111] at 38-39. At most, they assert that the Court should allow presentation of the evidence that Defendants failed to preserve the kites and allow the parties to argue for whatever inference they believe is appropriate by the trier of fact. *Id.* at 39.

As noted above, the determination of proper sanctions turns on the culpability of the Sheriff's alleged conduct. Plaintiff contends that the Sheriff not only intentionally destroyed

19

the inmate kites, but he attempted to hide their destruction during the litigation.   In support

of that position, Plaintiff cites the following:

- Sheriff Newman attended a course for new sheriffs in 2003 which emphasized that the Sheriff's department was required to have a records retention plan approved by the Colorado State Archives.  The instructor stated that if there was no plan, the department would need to retain all records indefinitely.  *June 3, 2014 Hearing Transcript* [#103] at 92:16-95:23.

- The Jail's only policy about records retention was that no records would be destroyed without the Sheriff's express authorization. *Plaintiff's Exh. 22* at 19**.**

- At some point between the summer of 2011 and July 20, 2012, Sheriff Newman destroyed approximately 12 to 17 boxes of Jail records. Plaintiff's Exh. 17 ("May 28, 2014 Newman Depo.") at 8:8-22, 22:19-23, 36:19-39; *June 3, 2014 Hearing Transcript* [#103] at 31:7-32:25.

- Sheriff Newman was personally involved in deciding which boxes should be shredded, although he can't recall how he made the determination.  Exh. 4 at 44:1-7; Exh. 17 at 45:19-23.  After deciding which boxes to shred, he carried them to the garage behind the Sheriff's Department and met a representative from Mobile Record Shredders.  *June 3, 2014 Hearing Transcript* [#103] at 22:7-14; 32:6-23.

- The documents destroyed likely included kites submitted by inmates from approximately 2000 to 2011.   *March 11, 2014 Newman Transcript* at 42:10-19; 45:12-23; *Plaintiff's Exh. 9* at 3; *June 3, 2014 Hearing Transcript* [#103] at 29:15-30:19; *May 28, 2014 Newman Depo.* at 28:15-30:5.

- Sheriff Newman testified that the boxes of documents were likely shredded "in conjunction with another shredding" by another county department.  He produced an invoice from Mobile Record Shredders dated July of 2012 and testified that "it possibly could be" the invoice for shredding the Jail's boxes  of documents, but he "[doesn't] know for a fact."  The invoice is addressed to the Huerfano County Finance Dept.  *May 28, 2014 Newman Depo.* at 5:4-21, 6:17-24; *Plaintiff's Exh. 15* (Certificate of Destruction dated July 20, 2012).  He believes that the County paid for the Jail's documents to be shredded and that the Jail was not separately invoiced.  *May 28, 2014 Newman Depo.*

at 23:17-24:16. Despite the fact that he did not participate in another document purge during his eleven years as Sheriff, he cannot remember when the boxes of documents were shredded. *May 13, 2014 Hearing Transcript* [#99] at 67:11-17.

- According to an affidavit from the Mobile Record Shredders' employee who was responsible for providing services in Walsenburg, he did not travel to or shred any documents for the Jail in May, June, July or August of 2011. *Plaintiff's Proposed Facts*, Exh. 1 [#113-1] ¶ 4.

- The County's "complete history of payments to Mobile Record Shredders from 2006 to 2014" does not reflect any payment in 2011. *Plaintiff's Exh. 16*; *May 28, 2014 Newman Depo.* at 22:7-10; [#103] at 33:10-34:6. Nevertheless, Mobile Record Shredders' provided an invoice ([#113-1] at 3) and a daily routing document which reflect a trip to Walsenburg on July 20, 2011 to shred documents for the Huerfano County Department of Social Services. *Plaintiff's Supplement to Proposed Findings of Fact and Conclusions of Law Regarding Defendant's Spoliation of Evidence*, Exh. 36(b) [#124-4] at 3.

Despite Plaintiff's insistence to the contrary, the Court cannot agree that this evidence suggests that "Sheriff Newman *intentionally* had numerous boxes of records shredded *after* he had received Plaintiff's CGIA notice of claim on September 2, 2011." *Plaintiff's Proposed Facts* [#113] at 5 (emphasis in original). Instead, the evidence suggests that the shredding may have occurred in July of 2011, approximately six months after the Jail was cleaned, four months after Mr. Montoya's incarceration, and two months *before* the Sheriff received the CGIA notice, or it may have occurred approximately a year later, in July of 2012. No definite conclusion can reasonably be drawn from the evidence about the approximate date of the shredding due to conflicting invoice dates, the testimony about the Jail "piggy-backing" on shredding for other County departments, and the Sheriff's purported inability to remember when the shredding occurred.

The evidence relating to the Sheriff's attempts to locate and produce these important inmate records is set forth below in chronological order.

21

- When Sheriff Newman responded to Plaintiff's First Set of Requests for Production of Documents on January 16, 2013, he stated that "County Defendants are not in possession of any written requests for medical treatment submitted by or on behalf of Mr. Montoya between March 3, 2011 and March 10, 2011.  It is believed that any such request, if any, may be in the possession of Defendant Neece." *Plaintiff's Exh. 5* at 9-10.

- At his first deposition taken on June 13, 2013, Sheriff Newman testified that he did not believe that any inmate kites had been "thrown away" for as long as he had been Sheriff.  *June 13, 2013 Newman Depo.* at 83:4-6.   He further testified that there were "a lot of inmate files" in a locked storage room at the Jail, and "another room that's off the washroom or laundry room that we store stuff in, too."  He stated that he had searched for inmate kites and "found 2011 kites and [] gone through them all and we have not located one for Mr. Montoya for [March of 2011]."  *Id.* at 83:11-18; 86:3-14.

- In September of 2013, Sheriff Newman responded to a written discovery request for all inmate kites from the last five years by objecting that the request was unduly burdensome because "such requests are typically, but not always, kept in the inmate file for the inmate submitting the request and would require jail staff to pull and review all inmate files to locate documentation responsive to this request."  *Plaintiff's Exh. 7* at 3.

- In January of 2014, Sheriff Newman supplemented his written discovery responses to indicate that "for the years 2010 and 2011, County Defendants are only able to produce medical requests from a portion of 2011.  Medical requests prior to that time have not been located despite searching and it is believed that such records were destroyed in 2011 at some point following the cleaning in late 2010 and early 2011."  *Plaintiff's Exh. 9*  at 3.

- At his second deposition, in March of 2014, the Sheriff testified that "when we did the cleaning . . . we did go through a lot of the boxes and files trying to get rid of stuff.  So they – whatever was given – whatever had been gotten rid of was shredded."  He testified that this "probably" occurred in the summer of 2011, but he didn't know the exact date.  *March 11, 2014 Newman Depo.* at 42:21-43:25.

- During his testimony at the first hearing on the Motion, held on May 13, 2014, Sheriff Newman reiterated that although the detention staff couldn't find inmate kites from before September of 2011, he didn't know when the document "purge" occurred.  *May 13, 2014 Hearing*

*Transcript* [#99] at 60:4-63:12.  He further stated that his response to the written discovery request about inmate kites being kept in individual inmate files was wrong because he "assumed [detention staff] had done what I asked.  I didn't realize they hadn't." *Id.* at 76:21-25.  He further admitted that at the time of responding to the written discovery requests, he knew that all of the kites from 2010 until September of 2011 were "gone." *Id.* at 77:15-17.  He stated that he didn't "know they [were] actually destroyed for a fact.  It [was] just a possibility." *Id.* at 79:20-24.  He admitted that "when we shredded the boxes, we looked at the boxes and saw what they were labeled at.  I don't remember actually going through each box to see what was actually in there.  I went by what was written on the box, and I'm finding out now that that's not always accurate." *Id.* at 58:1-6.  He stated that he believed the boxes contained outdated, unnecessary records but he did not personally go through the documents to verify that. *Id.* at 87:9-16.

- At his third deposition, on May 28, 2014, Sheriff Newman provided a copy of Mobile Record Shredders' July 20, 2012 invoice to opposing counsel and testified that the shredding of inmate records could have occurred then.  He added that he had "contacted somebody in the County Clerk's and Recorder's Office and asked who they used to do their shredding, and then asked them when they came if they would send them over to our building to shred." *May 28, 2014 Newman Depo.* at 31:10-14.  He added that he was present when Mobile Record Shredders arrived, that the company representative was driving "a big box truck," and that there was at least one person from the company in the truck, who "asked if any of the boxes had binders with the big round metal rings in it, because they couldn't shred that.  That's the only thing I remember." *Id.* at 38:16-39:19.

- During his testimony at the second hearing on the Motion, held on June 3, 2014, Sheriff Newman testified that he was not aware of documents that would reflect shredding of any county documents by Mobile Record Shredders in 2011. *June 3, 2014 Hearing Transcript* [#103] at 33:11-34:4.  He admitted that notations on kite forms generally reflected whether they were approved or not and a reason for non-approval. *Id.* at 16:9-18.

In sum, Sheriff Newman's testimony about inmate kites evolved.  He first professed to believe that Dr. Neece must have had Mr. Montoya's kites (January of 2013).  A short time later, he also professed to believe that no inmate kites had ever been discarded during

his tenure as Sheriff.   He implied that a search for kites had been conducted, that those from 2011 had been found, and there were none from Mr. Montoya (June of 2013). Three months later he stated under oath that inmate kites were typically kept in inmate files (September of 2013).   Finally, a year after his first statement about inmate kites, he admitted that he could only produce those from "a portion of 2011" because he believed the rest were destroyed "at some point following the cleaning in late 2010 and early 2011." (January of 2014).

The focus then shifted to trying to pin down the date when the bulk of the inmate kites from 2010 and 2011 had been destroyed.  In March of 2014, Sheriff Newman stated that the destruction "probably" occurred in the summer of 2011, but he didn't know the exact date.   Two months later he reiterated that he did not know when the purge occurred, and that his assumption about inmate kites being kept in inmate files was wrong.  He stated that the purpose of the purge was to get rid of old, unnecessary documents after the cleaning, and that he had done a cursory review of box labels in deciding which boxes to destroy without checking their contents (May of 2014).   Two weeks later he produced an invoice from Mobile Record Shredders dated July of 2012, a date that is not advantageous to him or the County in this litigation.   He recalled previously undisclosed details of the shredding and stated that he asked the County Clerk and Recorder's Office to send the shredder over to the Jail "when they came." (May of 2014).   Finally, he admitted that there are no documents showing any shredding of County documents by Mobile Record Shredders in 2011, but he continued to maintain that if the kites were destroyed, "it would have been in the 2011 time frame."   (June of 2014).   *June 3, 2014 Hearing Transcript* [#103] at 21:15-21.

24

The timeline described above is consistent with bungled record-keeping, bungled records management, poor memory and extreme carelessness, but it is not consistent with bad faith.  If the Sheriff were trying to hide proof that he destroyed relevant evidence that he had a duty to preserve, he would not have gratuitously produced evidence of shredding that occurred eleven months after he received notice of a potential claim.  He would not have freely admitted that his orders were not followed, that he didn't look inside the boxes he sent to the shredder, and that generally his attempts to maintain organized records were not only woefully inadequate but likely in violation of Colorado law.  He would not have boldly testified under oath that no inmate kites were ever destroyed during his tenure, only to have to recant that testimony by admitting the kites were likely shredded when placed in mislabeled boxes.  Taken as a whole, this is a portrait of ineptitude, not malfeasance.

The Court declines to impose the severe sanctions sought by Plaintiff in this case.

> "Judges must be careful to tailor the remedy to the problem, and 'take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms.'  The sanction to be applied needs to be one which is appropriate to the truth-finding process, not one that serves only further to suppress evidence . . . .  Sanctions which preclude the admission of certain evidence or provide for a negative inference in the place of destroyed evidence operate as the same fashion as a default judgment.  They intrude into the 'truth-finding process' of a trial, and represent 'grave steps' for a trial judge to take.  Such sanctions should be considered with very great restraint."

*Gates,* 167 F.R.D. at 106-07 (citations omitted).  Although it is apparent that inmate kites were lost or destroyed by Defendants and that Plaintiff has been prejudiced, the Court does not find that Plaintiff has sustained his burden of demonstrating that Defendant Newman acted in bad faith.  *Turner*, 563 F.3d at 1149.  Nevertheless, some sanction is appropriate

due to the negligent spoliation of evidence demonstrated here.  Accordingly, the Court grants the Motion in part.  The parties shall be permitted to present evidence relating to the lost or destroyed kites and to argue whatever inferences they hope the jury will draw. Further management of such evidence will be left to the discretion of the District Judge at trial.

Finally, Plaintiff shall be awarded his reasonable costs and attorneys' fees incurred in making the Motion.  *See FatPipe Networks India, Ltd. V. Xroads Networks, Inc.,* No. 2:09-cv-186 TC DN, 2012 WL 192792, at *6 (D. Utah Jan. 23, 2012); *Asher Assocs., LLC v. Baker Hughes Oilfield Operations, Inc.,* No. 07-cv-01379-WYD-CBS, 2009 WL 1328483, at *12 (D. Colo. May 12, 2009).  Plaintiff shall file an affidavit in support of the award of fees and costs in accordance with D.C.COLO.LCivR 54.3 on or before **July 20, 2015.** Defendants may respond on or before **August 3, 2015**.  No reply will be permitted.

### III. Conclusion

For the reasons discussed above,

IT IS HEREBY **ORDERED** that the Motion [#86] is **GRANTED in part** and **DENIED in part** as set forth above.

IT IS FURTHER **ORDERED** that Plaintiff is awarded his reasonable costs and attorneys' fees incurred in filing the Motion, to be determined in accordance with the briefing schedule set forth above.

Dated:  July 7, 2015

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge