**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 12-cv-02362-REB-KLM

RAYMOND MONTOYA,

        Plaintiff,

v.

BRUCE NEWMAN, in his official capacity as the Sheriff of Huerfano County Jail,
LARRY GARBISO,
DOE #1, 2 - detention center officer at Huerfano County Jail,
DOE #1-2, medical staff member at Huerfano County Jail, and
CHARLES NEECE, M.D.,

        Defendants.

---

**ORDER CONCERNING MOTION FOR SUMMARY JUDGMENT**

---

**Blackburn, J.**

        This matter is before me on the **County Defendants' Motion for Summary**

**Judgment** [#79][1], filed March 31, 2014. The plaintiff filed a response [#162], and the

defendants filed a reply [#174].  I grant the motion in part and deny it in part.

## I.  JURISDICTION

        I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question).

## II.  STANDARD OF REVIEW

        The purpose of a summary judgment motion is to assess whether trial is

necessary.  ***White v. York Int'l Corp.***, 45 F.3d 357, 360 (10th Cir. 1995).  FED. R. CIV.

P. 56 (a) provides that the court may grant summary judgment when "if the movant

---

[1]    "[#79]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's case management and electronic case filing system (CM/ECF). I use this
convention throughout this order.

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(a);** *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994).  Summary judgment may be granted if the court concludes that no "rational trier of fact" could find for the nonmoving party based on the showing made in the motion and response.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal citation and quotation omitted).  Once such a motion has been supported properly, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper.  *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994), *cert. denied*, 540 U.S. 1027 (1995).  In all summary judgment proceedings, the evidence in the record must be viewed in the light most favorable to the party opposing the motion.  *Simms v. Oklahoma ex rel Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999).

### III.  FACTS

This statement of facts is based on the evidence in the record viewed in the light most favorable to the plaintiff.  The claims of the plaintiff arise from the detention of the plaintiff, Raymond Montoya, in the Huerfano County Jail (HCJ) in Walsenberg, Colorado.  Mr. Montoya was held in the jail from March 3 through March 10, 2011.  He

2

says he became increasingly ill while he was in the jail.  Shortly after he was released
from the jail, he was hospitalized with a grave respiratory illness.

   Mr. Montoya was on state probation when he was placed in the HCJ on March
3, 2011.  He was placed in the jail after his probation officer found Mr. Montoya had
tested positive for cocaine use.  Mr. Montoya agreed to complete an inpatient residential
treatment program in Alamosa, Colorado.  *Motion for summary judgment* [#79-10],
Exhibit A-10.  Without any intervening court proceedings, his probation officer requested
that Mr. Montoya be released from the HCJ on March 10, 2011, when staff from the
Alamosa facility would be in Walsenberg to pick up Mr. Montoya.

   On March 5, 2011, Mr. Montoya began to experience symptoms of his illness.
He says he became increasingly ill in the subsequent days.  According to Mr. Montoya,
on March 5, he requested a kite by using the intercom in his cell, "so (he) could put in to
see a doctor" *Response exhibits* [#163], Exhibits 22 & 23 (*Montoya Deposition)*, 116:5 -
7.  A kite is a form used by inmates to make requests of their jailers.  On the evening of
March 5, defendant Larry Garbiso brought a kite to Mr. Montoya who promptly
completed it.  In response to the kite, Mr. Garbiso said "It looks like you are not sick to
me." *Montoya Deposition*, 116:10 - 11.  Mr. Montoya says he asked Mr. Garbiso and all
other jailers for help every day from March 5 through March 9.  *Montoya Deposition*,
116:25 - 117:4.  Sometimes he asked face to face; often he asked via the intercom in
his cell.  Often, he could not identify the person to whom he spoke via intercom.

   Two days later, on March 7, Mr. Montoya submitted a second kite requesting a
visit with a doctor. *Montoya Deposition*, 118:22 - 24.  At one point in his deposition, Mr.
Montoya says he  gave the kite to one of the jailers, but he does not recall who.  119:1 -
3.  At a different point in his deposition, Mr. Montoya says he asked for another kite on

the evening of March 7,  and "I believe Larry [Garbiso] brought me one, and he stated to me he was tired of all of these inmates submitting kites, you aren't really sick." *Montoya Deposition*, 136:11 - 13.  Mr. Montoya says he completed the kite, and Mr. Garbiso took it.

Not surprisingly, Mr. Garbiso disputes the version of events described by Mr. Montoya concerning the submission of kites.  However, addressing the motion for summary judgment of the defendants, I must view the evidence in the light most favorable to Mr. Montoya.  Thus, on this issue and others, I rely primarily on the version of events described by Mr. Montoya.

When Mr. Montoya asked jailers about the status of his requests to see a doctor, he was told "it was up to Larry [Garbiso] to make that decision as far as the request getting approved, and a doctor being able to see me." *Montoya Deposition*, 135:18 - 20.  Mr. Montoya also was told [Sheriff] Bruce Newman could make the decision. *Montoya Deposition*, 119:21 - 25; 138:9 - 10.  In the HCJ generally, approval of kites requesting a doctor visit was considered by he highest ranking officer present in the jail. As the jail administrator, Larry Garbiso often made these decisions.  *Response exhibits* [#163], Exhibit 31 [#163-31] (*Sierra Deposition*) 11:14 - 12:13; Exhibit 16 [#163-16] (*Garbiso Deposition*) 58:5 - 7.

Mr. Montoya says the symptoms of his illness became increasingly worse after March 5.  By March 7, he says he "started noticing that my urine was changing colors. It was getting darker.  The coughing and the coughing up phlegm was getting worse with blood in it.  I was sweats, all day I was sweating.  Just tossing and turning in my bunk, you know, on the intercom asking for help." *Montoya Deposition*, 136:3 - 9.  He says that since March 5, he had not been able to keep food down and had been short of

4

breath.  *Montoya Deposition*, 54:6 - 7; 122:18 - 123:2.

Mr. Montoya submitted another kite on March 8 or 9.  This kite was submitted to a jail employee named Roxi.  *Montoya Deposition*, 139:3 - 4.  Describing his symptoms on March 8, Mr. Montoya says "I was coughing up phlegm that was red already.  There was blood in it.  When I did use the - - urinate and use the restroom, it was real dark like - - like apple cider, you know.  I was sweating, coughing.  Had a fever.  Had a headache.  All of it all at once."  *Montoya Deposition*, 140:24 - 141:5.  He also had a cold sweat.  *Id.*  The testimony of Mr. Montoya indicates that his shortness of breath and inability to eat also continued.  *Montoya Deposition*, 54:6 - 7; 122:18 - 123:2.

HCJ inmate Carlos Vigil was a trustee in the jail while Mr. Montoya was there.  Mr. Vigil observed Mr. Montoya's symptoms between March 3 and March 10, 2011.  *Response exhibits* [#163] Exhibit 24 [#163-24] (*Vigil Affidavit*).  Mr. Vigil says Mr. Montoya "appeared very ill.  I saw that he had a serious cough, he sneezed repeatedly, he tried desperately to clear his throat over and over again, and he looked pale to me.  He obviously needed to see a doctor."  *Id.*, ¶ 3.  On several occasions, Mr. Montoya complained about severe pain.  *Id.*, ¶ 4.  Between March 3 and March 10, on different days, Mr. Vigil spoke to Mr. Garbiso three or four times about Mr. Montoya.  Mr. Vigil told Mr. Garbiso how bad Mr. Montoya's symptoms were and asked if Mr. Garbiso would allow Mr. Montoya to see a doctor.  Mr. Garbiso ignored the requests of Mr. Vigil and several times told Mr. Vigil to butt out.  *Id.*, ¶ 6.

HCJ inmate Laqun Murphy was in the jail during the period from March 3 to 10, 2011.  *Response exhibits* [#163] Exhibit 25 [#163-25] (*Murphy Declaration*), ¶ 2.  Mr. Murphy says Mr.  Montoya appeared sick and exhibited obvious signs of illness.  *Id.*, ¶ 3.  His symptoms got worse each day.  *Id*, ¶ 4.  Mr. Murphy witnessed Mr. Montoya's

requests to see a doctor and Mr. Garbiso's comments in response, like "you don't look sick to me." *Id.*, ¶ 6.  In the middle of the week when Mr. Montoya was in the jail, Mr. Murphy told Mr. Garbiso that Mr. Montoya looked very sick and needed to see a doctor. *Id.*, ¶ 8.  Mr. Garbiso replied, "none of your business." *Id.*

Diana Torres, Mr. Montoya's sister, visited Mr. Montoya in the jail "almost every single day" between March 3 and March 10, 2011.  *Response exhibits* [#163] Exhibit 26 [#163-26] (*Torres Affidavit*), ¶ 2.  Mr. Montoya appeared ill on the 4th or 5th and grew progressively more ill each day.  *Id.*, ¶ 3.  Mr. Montoya's cough became increasingly worse, becoming severe.  Ms. Torres saw him have difficulty breathing.  His complexion grew to a pale grey.  He repeatedly complained of pain, nausea, and inability to eat.  *Id.*, ¶ 4.  On March 9, Torres saw a rash growing on his face.  "He looked deathly ill." *Id.* "During the five days that I saw him, it would have been obvious to anyone that Raymond needed to see a doctor.  *Id.*, ¶ 5.  After seeing Mr. Montoya get increasingly worse, Ms. Torres asked Mr. Garbiso if Mr. Montoya could see a doctor.  Ms. Torres says "Garbiso did not seem to take my request seriously." *Id.*, ¶ 6.

On March 9, 2011, Mr. Montoya was examined by Dr. Charles Neece.  The examination took place at the HCJ.  Mr. Montoya explained his symptoms to Dr. Neece. *Montoya Deposition*, 142:5 - 143:3.  Dr. Neece told Mr. Montoya that he had a case of bronchitis.  Dr. Neece told Mr. Montoya to take some pain killers or cold medicine.  Dr. Neece also prescribed an antibiotic, but that medication was not obtained until the following day.  Mr. Montoya protested that something was wrong and said he would like to go to the hospital.  Dr. Neece said it was up to the sheriff or the jailers to determine if Mr. Montoya could go to the hospital.

The next day, March 10, Mr. Montoya was picked up at the HCJ to be

transported to the inpatient program in Alamosa.  When he arrived, a staff member sent Mr. Montoya to the emergency room at the San Luis Valley Regional Medical Center. At the hospital, Mr. Montoya was diagnosed with several conditions including Methicillin-resistant Staphylococcus Aureus (MRSA), necrotic pneumonia, sepsis, and respiratory failure.  On March 16, 2011, Mr. Montoya was transferred to a hospital in Pueblo. *Response exhibits* [#163] Exhibit 40 [#163-40] (*Discharge Summary*), p. 3.  He was hospitalized until March 25, 2011.

According to Mr. Montoya, from 2001 to 2011, conditions of confinement at the HCJ were unsanitary and unhealthy.  Leaks, moisture, and humidity problems were common.  The heating, ventilation, and air conditioning (HVAC) system often malfunctioned and provided inadequate ventilation.  In 2009, extensive black mold was growing on the walls and ceilings in parts of the jail.

In August of 2010, jail employees wrote a letter to Larry Garbiso, the jail administrator.  Staff complained about various issues in the jail, including inmates with staph infections, "mainly (MURSA) (sic).  This is highly contagious, and we have seen numerous cases."  *Response exhibits* [#163] Exhibit 9 [#163-9].

Air sampling performed in the jail in October of 2010 did not identify elevated concentrations of mold or bacteria in the indoor air.  *Motion for summary judgment*, Exhibit A-7, p. 2.  A major cleaning of the HCJ was undertaken in late 2010.  Mr. Montoya contends the moisture problems and the problems with the HVAC system were not addressed when the cleaning was undertaken.  Mr. Montoya claims jail conditions likely contributed to his illness in March 2011.

In his complaint [#7], Mr. Montoya asserts a claim for violation of his rights under the Eighth or Fourteenth Amendments by defendants, Larry Garbiso and Dr. Charles

Neece.[2]   At the relevant time, Mr. Garbiso was the jail administrator at the HCJ.  Dr. Neece examined Mr. Montoya at the HCJ on March 9, 2011, told Mr. Montoya to take some pain killers or cold medicine, and prescribed an antibiotic.  Mr. Montoya claims Mr. Garbiso and Dr. Neece were deliberately indifferent to the serious medical needs of Mr. Montoya and that indifference injured Mr. Montoya.

In addition, Mr. Montoya asserts a claim for violation of his rights under the Eighth or Fourteenth Amendments against defendant, Bruce Newman, Sheriff of Huerfano County.  This claim is asserted against Sheriff Newman in his official capacity. Mr. Montoya contends the policies, practices, and procedures adopted by Sheriff Newman for the HCJ were a moving force behind the violation of the constitutional rights of Mr. Montoya.

Finally, Mr. Montoya asserts a negligence claim against all defendants. This claim is based on the same facts as his other claims.

## IV.  QUALIFIED IMMUNITY

Mr. Garbiso contends he is entitled to qualified immunity because Mr. Montoya has not shown a violation of a clearly established constitutional right.  Specifically, Mr. Garbiso contends the evidence does not show that Mr. Garbiso was deliberately indifferent to the serious medical needs of Mr. Montoya.  Mr. Garbiso contends there is no evidence: (a) that Mr. Garbiso was aware of any serious risk to Mr. Montoya; and (b) that Mr. "Garbiso acted unreasonably."  *Motion for summary judgment* [#79], p. 17.  Mr. Garbiso notes that Mr. Montoya was given a kite, Mr. Montoya requested medical care via the kite, and an appointment with Dr. Neece was scheduled.  If so, Mr. Garbiso

---

[2]  As discussed in greater detail below, the Fourteenth Amendment is applicable to this claim if Mr. Montoya is seen as a pretrial detainee.  The Eighth Amendment is applicable if Mr. Montoya  is seen as an inmate serving a sentence.  In either case, the applicable standard is the same.

contends, Mr. Montoya cannot show deliberate indifference to his serious medical needs.

A motion for summary judgment asserting qualified immunity must be reviewed differently from other summary judgment motions. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part, Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Holland v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001), *cert. denied*, 535 U.S. 1056 (2002). After a defendant asserts qualified immunity, the burden shifts to the plaintiff. *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000). An assertion of qualified immunity may be overcome only when the record demonstrates clearly that the plaintiff has satisfied a heavy two-part burden: (a) evidence of a violation of a constitutional right; and (b) the right at issue was clearly established at the time of the alleged violation.

To establish "that the defendant's actions violated a constitutional or statutory right," the plaintiff must come forward with evidence to establish specific facts which, if true, show a violation. *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995); *Taylor v. Meacham*, 82 F.3d 1556, 1559 (10th Cir.1996). In addition, the plaintiff must "show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

To show clearly established law, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts," which find the law to be as the plaintiff maintains. *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992), *overruled in part, Williams v. City & Cnty. of Denver*, 99 F.3d 1009, 1014 - 1015 (10th Cir. 1996). Absent binding Supreme

Court or Tenth Circuit authority, the plaintiff must show a "robust consensus of cases of persuasive authority" in the Courts of Appeals. *Taylor v. Barkes*, ___ U.S. ___, ___,135 S.Ct. 2042, 2044  (2015) (quoting *City and Cnty. of San Francisco v. Sheehan*, ___ U.S. ___, ___, 135 S.Ct. 1765, 1778 (2015)). The plaintiff also must demonstrate a substantial correspondence between the conduct in question and prior law establishing that the defendant's actions clearly were prohibited.  *Hilliard v. City & Ctny. of Denver*,  930 F.2d 1516, 1518 (10th Cir. 1991) (citing *Hannula v. City of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990)).  However, the plaintiff need not establish a "'precise factual correlation between the then-existing law and the case at hand . . . .'" *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir.1992), (quoting *Snell v. Tunnell*, 920 F.2d 673, 699 (10th Cir. 1990)).

 If the plaintiff satisfies both of these elements, then the burden shifts to the defendant.  Unless the defendant demonstrates that there is no disputed issue of material fact relevant to the immunity analysis, a motion for summary judgment based on qualified immunity must be denied. *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir.1991).

## A.  Constitutional Violation

To establish a constitutional claim for denial of medical care, Mr. Montoya must prove both an objective and a subjective component.[3]  First, he must "produce objective

---

[3]  If Montoya is viewed as a pretrial detainee, his denial of medical care claim must be analyzed under the Due Process Clause of the Fourteenth Amendment.  If he  is viewed as an inmate serving a sentence, his claim must be analyzed under the Eighth Amendment.  In either case, the applicable standard is the same.  "Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases . . . ."  *Estate of Booker v. Gomez* 745 F.3d 405, 430 n. 30 (10th Cir. 2014) (citation and internal quotation omitted).  Like a convicted inmate, a pretrial detainee must provide proof of both the objective and subjective components of deliberate indifference.  *Id*. at 430.

evidence that the deprivation at issue was in fact sufficiently serious." ***Estate of Booker v. Gomez***, 745 F.3d 405, 430 (10th Cir. 2014) (internal quotation and citation omitted). "[A] medical need is sufficiently serious if it is one ... that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." ***Id***. Second, under the subjective component, Mr. Montoya must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind." ***Id***. (internal quotation and citation omitted). "He must show that the prison official acted or failed to act despite his knowledge of a substantial risk of serious harm." ***Id***. "The Supreme Court [has] cautioned that 'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." ***Id***. However, deliberate indifference does not require a finding of express intent to harm. ***Mata v. Saiz***, 427 F.3d 745, 752 (10th Cir. 2005) (internal quotation and citation omitted). But "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in usual ways, including inference from circumstantial evidence." ***Booker***, 745 F.3d at 430. "(T)he factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." ***Id***.

**(1) Objective Component** - Addressing the objective component, the defendants concede that MRSA and pneumonia "are likely serious medical conditions." *Motion for summary judgment* [#79], p. 12 n. 2. The defendants note that, in the case of Mr. Montoya, it is not clear when those conditions had developed to the point that they became a serious condition. For the purpose of the motion for summary judgment, the defendants concede that Mr. Montoya's condition, at least as of March 10, 2011, was sufficiently serious to satisfy the objective component. *Id.* Mr. Montoya was seen by

Dr. Neece on March 9 and was released from the HCJ on March 10.  As to Mr. Garbiso, this qualified concession is of little consequence.  The key question is whether there is evidence that Mr. Montoya's condition became a serious medical need between March 5th and 9th, when he was in contact with Mr. Garbiso, one of the jail officials who determined whether or not Mr. Montoya could see a doctor.

As of March 7, Mr. Montoya exhibited the following symptoms.  His urine was changing colors and was getting darker.  He was coughing with increasing frequency and coughing up bloody phlegm.  He was having frequent sweats.  He had not been able to keep food down since March 5.  He had been short of breath since March 5.  At or about this time, two other inmates who had observed Mr. Montoya told Mr. Garbiso they thought Mr. Montoya needed a doctor.  Mr. Montoya's sister observed his symptoms and thought Mr. Montoya needed to see a doctor.  She relayed this information to Mr. Garbiso.   Arguably, these statements indicate that Mr. Montoya's need for medical care was obvious to even a lay person.  Based on this and other evidence, including Mr. Montoya's condition three days later, a reasonable jury could conclude that Mr. Montoya had a serious medical need at least as of March 7.  Generally, it is not disputed that Mr. Montoya continued to deteriorate after March 7.  Thus, Mr. Montoya has established the objective component.

**(2)  Subjective Component** - To establish the subjective component, Mr. Montoya must show that Mr. Garbiso acted or failed to act despite his knowledge of a substantial risk of serious harm to Mr. Montoya.  In this case, Mr. Montoya claims Mr. Garbiso knew of Mr. Montoya's symptoms and deteriorating condition but failed to permit Mr. Montoya to see a doctor.

On March 5 and 7, Mr. Montoya says that he spoke in person with Mr. Garbiso

about his need to see a doctor and that Mr. Garbiso observed Mr. Montoya at those times.  Mr. Montoya says he submitted to Mr. Garbiso written requests to see a doctor on both March 5 and March 7.  Given descriptions of jail procedures evidenced in the record, one reasonably can infer that Mr. Montoya's other requests to see a doctor, although not made directly to Mr. Garbiso, likely were referred to Mr. Garbiso for approval.  Between March 5 and 9, two other inmates and Mr. Montoya's sister expressed to Mr. Garbiso concern about Mr. Montoya's condition and asked that he be permitted to see a doctor.  Viewing the evidence in the record in the light most favorable to Mr. Montoya, there is no question Mr. Garbiso was aware of Mr. Montoya's symptoms.

On the current record, it is not clear who arranged for Mr. Montoya to see Dr. Neece on March 9.  Mr. Montoya contends there is no evidence that Mr. Garbiso ever approved the requests of Mr. Montoya to see a doctor.  Sheriff Newman testified that, on March 9, Dr. Neece was not called to come to the jail to see Mr. Montoya.  *Response exhibits* [#163] Exhibit 27 [#163-27] (*Newman Deposition*), 47:2 - 12.  Rather, while Dr. Neece was there to see another inmate, an unknown member of the jail staff told Mr. Montoya to see Dr. Neece.  *Id.*

Even if Mr. Garbiso can show he approved the visit of Dr. Neece with Mr. Montoya on March 9, Mr. Montoya contends the delay in arranging medical treatment for Mr. Montoya constitutes deliberate indifference to his serious medical needs.  On March 7 or earlier, Mr. Garbiso knew Mr. Montoya had bloody phlegm and dark - possibly bloody - urine combined with fever, coughing, shortness of breath, and an inability to eat. These symptoms reasonably can be seen as showing a serious medical need requiring prompt medical attention, as opposed to medical attention two days

13

later.  A reasonable jury could see the failure of Mr. Garbiso to call a doctor on March 7 as a failure to act despite knowledge of a serious medical need.  Thus, Mr. Montoya has established the subjective component.

  **(3)  Conclusion - Constitutional Violation** - I note that Mr. Garbiso disputes the nature of the symptoms suffered by Mr. Montoya between March 5 and March 9.  Mr. Garbiso contends nothing about Mr. Montoya during that time period evidenced that Mr. Montoya had a serious medical need and an urgent need to be seen by a doctor. Absent knowledge of a serious medical need, Mr. Garbiso notes, he cannot be said to have been deliberately indifferent to a serious medical need.  It may be that, in the end, the evidence will substantiate this position.  However, addressing the issue of qualified immunity in the context of a motion for summary judgment, I must view the evidence in the record in the light most favorable to the plaintiff.  Viewed from that perspective, the evidence in the record demonstrates that Mr. Garbiso was aware of a serious medical need of Mr. Montoya.  Further, viewed in the light most favorable to the plaintiff, the evidence in the record shows that Mr. Garbiso was deliberately indifferent to that serious medical need by delaying for two days examination of Mr. Montoya by a doctor or by failing to approve such an examination at any time.  For the purpose of a qualified immunity analysis in the context of summary judgment, Mr. Montoya has established a constitutional violation.

B.  Clearly Established Law

  As of March 7, 2011, the law surrounding the denial of medical care to pretrial detainees and convicted inmates was clearly established.  ***See, e.g., Mata v. Saiz***, 427 F.3d 745, 761 (10th Cir. 2005) (convicted inmate); ***Estate of Hocker by Hocker v. Walsh***, 22 F.3d 995, 998 (10th Cir. 1994) (pretrial detainee).  "Although pretrial

detainees are protected under the Due Process Clause rather than the Eighth

Amendment, ... this Court applies an analysis identical to that applied in Eighth

Amendment cases brought pursuant to § 1983." *Lopez v. LeMaster*, 172 F.3d 756,

759 n. 2 (10th Cir.1999).  Mr. Garbiso concedes that, as of March of 2011, the right of

access to health care in a jail or prison was clearly established.  *Reply* [#174], p. 8.

Thus, the law which is the basis of the constitutional claim of Mr. Montoya against Mr.

Garbiso was clearly established as of the time of the alleged violation, March of 2011.

## C.  Conclusion

Faced with the claim of qualified immunity of Mr. Garbiso, Mr. Montoya has come

forward with evidence sufficient to show a constitutional violation by Mr. Garbiso and a

violation of clearly established law by Mr. Garbiso.  Therefore, the motion for summary

judgment of Mr. Garbiso based on his claim of qualified immunity must be denied.

## V.  OFFICIAL CAPACITY CLAIM

For purposes of his federal civil rights claim, Mr. Montoya has named Sheriff

Newman as a defendant in his official capacity as sheriff.  Sheriff Newman is not named

as a defendant in his individual capacity.  Sheriff Newman contends he is entitled to

summary judgment on the official capacity claim against him.

A suit against Sheriff Newman in his official capacity is, in essence, a suit against

Huerfano County.

> (L)ocal governing bodies can be sued directly under § 1983 for monetary,
> declaratory, or injunctive relief where ... the action that is alleged to be
> unconstitutional implements or executes a policy statement, ordinance,
> regulation, or decision officially adopted and promulgated by that body's
> officers. Moreover, although the touchstone of the § 1983 action against a
> government body is an allegation that official policy is responsible for a
> deprivation of rights protected by the Constitution, local governments,
> like every other § 1983 "person," by the very terms of the statute, may be sued
> for constitutional deprivations visited pursuant to governmental "custom"

> even though such a custom has not received formal approval through the
> body's official decision making channels.

*Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690-91

(1978).  Official municipal policy includes the decisions of a government's lawmakers,

the acts of its policymaking officials, and practices so persistent and widespread as to

practically have the force of law.  These are the actions for which the municipality is

actually responsible.  *Connick v. Thompson*, ___ U.S. ___, ___, 131 S.Ct. 1350, 1359

(2011).

To establish municipal liability under § 1983, Mr. Montoya must present evidence

that (1) there was a policymaker; (2) a policy or custom existed; (3) such custom or

policy was the cause in fact or moving force behind the underlying constitutional

violation; and (4) the municipal action was taken or the policy adopted with "deliberate

indifference" to its known or obvious consequences.  *See, e.g.*, *Piotrowski v. City of*

*Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (assembling cases); *Board of County*

*Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997) (discussing

deliberate indifference requirement).  "(R)igorous standards of culpability and causation

must be applied to ensure that the municipality is not held liable solely for the actions of

its employees."  *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S.

397, 405 (1997).

Proof of deliberate indifference in the context of an official capacity claim is

essentially the same as required for an Eighth Amendment claim.  A showing of simple

or even heightened negligence will not suffice.   In the medical care context,

"(d)eliberate indifference to serious medical needs may be shown by proving there are

such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is

effectively denied access to adequate medical care." *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985). The flaws in policy or training must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

In the present case, there is no dispute that Sheriff Newman was the policymaker. To some extent, there is dispute about what policies, practices, and customs existed in the HCJ when Mr. Montoya was incarcerated there and prior to his incarceration. The elements of cause in fact and deliberate indifference are the key issues.

In their motion for summary judgment [#79], the defendants seek summary judgment on the official capacity claim contending: (a) Mr. Montoya cannot establish an underlying constitutional violation; (b) there is no evidence that the rights of inmates routinely were violated because medical care was delayed or denied; (c) there is no evidence that any condition at the HCJ was the cause of any inmate illness, including that of Mr. Montoya; and (d) there is no evidence that any policy of Sheriff Newman presented a risk that inmates would be denied care for their serious medical needs.

A.  Adequacy of Pleading

In their reply [#174], the defendants argue that Mr. Montoya attempts improperly to expand his official capacity claim in his response [#162] to the motion for summary judgment. Looking to the allegations in count two of the complaint, the defendants contend the official capacity claim is limited to the allegation that Sheriff Newman "made or reviewed the decisions that deprived Mr. Montoya of reasonable medical care." *Complaint* [#7], ¶ 51.

In his complaint, Mr. Montoya makes additional relevant allegations.  He alleges in his complaint that Sheriff Newman was aware that the HCJ harbored disease that regularly afflicted jail inmates.  *Complaint* [#7], ¶ 16.  Despite his knowledge of dangerous health conditions in the jail, Mr. Montoya alleges, Sheriff Newman "did nothing to cure the health hazards that were endangering the inmates." *Id.*, ¶ 20. According to Mr. Montoya, Sheriff Newman failed to take action to clean the facility and to prevent affliction of HCJ inmates, including Mr. Montoya, with the illnesses harbored by the facility. *Id.*, ¶ 40.  Mr. Montoya contends he became gravely ill with the same disease or a similar disease that other inmates had suffered in the HCJ. *Id.*, ¶ 21. These factual allegations are part of the first claim for relief, which was dismissed by the court.  However, these allegations are incorporated in the second claim for relief. *Complaint* [#7], ¶ 42.

In his response [#162], Mr. Montoya asserts six bases for his official capacity claim against Sheriff Newman: (1) Failure to abate unsanitary conditions and disease in the jail; (2) Lack of adequate policies and procedures; (3) Failure to hire adequate medical staff or failure to adequately train existing staff to detect and manage serious medical needs; (4) Lack of adequate medical equipment and supplies; (5) Failure to maintain and make available adequate medical records; (6) Permitting detention staff to distribute medication.  The factual allegations in the complaint [#7], taken as a whole, relate only to the first of these six bases, the alleged failure to abate unsanitary conditions and disease in the jail. None of the factual allegations in the complaint relate to or even hint at any of the other five bases now asserted by Mr. Montoya for his official capacity claim against Sheriff Newman.

For a litany of reasons, courts generally do not consider claims raised for the first

time in a response to a dispositive motion. ***Lawmaster v. Ward***, 125 F.3d 1341, 1346 (C.A10th Cir. 1997). One key reason for this limitation is the fundamental requirement of due process that defendants be given fair notice of the nature of the claims against them and a reasonable opportunity to investigate and challenge those claims. As to bases two through six enumerated in the paragraph above, there is no indication that Mr. Montoya ever pled these bases or otherwise effectively preserved these specific bases for the official capacity claim against Sheriff Newman. Based solely on this failure to plead or otherwise preserve these aspects of the official capacity claim, Sheriff Newman is entitled to dismissal of the official capacity claim to the extent that claim is based on bases two through six enumerated in the paragraph above. Further, as explained in detail below, the evidence in the record does not support any of these bases for official capacity liability.

### B. Underlying Constitutional Violations

Mr. Montoya claims Mr. Garbiso, the jail administrator, was deliberately indifferent to Mr. Montoya's need for medical care when Mr.Garbiso refused to permit and arrange for Mr. Montoya to be seen by a doctor. Mr. Montoya finally was seen by a doctor on March 9. Dr. Neece did not refer Mr. Montoya to a hospital for urgent diagnosis and care and did not follow up to ensure Mr. Montoya received the medication prescribed by Dr. Neece. Mr. Montoya contends Dr. Neece also was deliberately indifferent to his serious medical needs. Mr. Montoya claims the polices and routine practices effectively approved and adopted by Sheriff Newman were a moving force behind this deliberate indifference to his serious medical needs.

In addition, Mr. Montoya alleges in his complaint that Sheriff Newman was aware that the HCJ harbored disease that regularly afflicted jail inmates. *Complaint* [#7], ¶ 16.

Despite his knowledge of dangerous health conditions in the jail, Mr. Montoya alleges,

Sheriff Newman "did nothing to cure the health hazards that were endangering the

inmates." *Id.*, ¶ 20.   According to Mr. Montoya, Sheriff Newman failed to take action to

clean the facility and to prevent infection of HCJ inmates, including Mr. Montoya, with

the illnesses harbored by the facility.   *Id.*, ¶ 40.   Mr. Montoya contends he became

gravely ill with the same disease or a similar disease that other inmates had suffered in

the HCJ.   *Id.*, ¶ 21.

### C.  Asserted Bases for Official Capacity Liability

In his response [#162] to the motion for summary judgment, Mr. Montoya relies

on six theories in support of his official capacity claim: (1) Failure to abate unsanitary

conditions and disease in the jail;  (2) Lack of adequate policies and procedures; (3)

Failure to hire adequate medical staff or failure adequately to train existing staff to

detect and manage serious medical needs; (4) Lack of adequate medical equipment

and supplies; (5) Failure to maintain and make available adequate medical records; (6)

Permitting detention staff to distribute medication.  I note that Mr. Montoya does not

argue in his response [#162] a theory of official capacity liability based on his allegation

that Sheriff Newman "made or reviewed the decisions that deprived Mr. Montoya of

reasonable medical care."  *Complaint* [#7], ¶ 51.  Mr. Montoya offers no evidence that

Sheriff Newman made or reviewed those decisions.  Thus, this discreet theory of official

capacity liability fails. Accordingly, I address each of the remaining bases *seriatim*.

**(1) Failure to abate unsanitary conditions and disease in the jail** - Much of

the evidence on which Mr. Montoya relies to support this theory concerns conditions in

the HCJ before 2011.  There is little dispute that the jail suffered from leaks as well as

moisture and humidity problems before 2011.  The HVAC system often malfunctioned

and provided inadequate ventilation.  In 2009, extensive black mold was growing on the walls and ceilings in parts of the jail.  It is undisputed that air sampling performed in the jail in October 2010 did not identify elevated concentrations of mold or bacteria in the indoor air.  *Motion for summary judgment*, Exhibit A-7, p. 2.

A major cleaning of the HCJ was undertaken in late 2010.  The cleaning required that all inmates be removed from the jail.   Mr. Montoya contends the moisture problems and the problems with the HVAC system were not addressed when the cleaning was undertaken and, for the most part, that is undisputed.  Mr. Montoya claims these jail conditions likely contributed to his illness in March 2011.  A letter from the Las Animas-Huerfano Counties District Health Department, dated December 8, 2010, indicates that the health department inspected the jail after the cleaning and concluded that the mold problem in the jail had been effectively mitigated or eliminated by the cleaning. *Response exhibits* [#163] Exhibit 13 [#163-13] (*Health Department Letter*).  This fact is not disputed.  However, the health department noted also that the HVAC system still needed repair, certain duct work should be cleaned, and additional vent fans should be installed to control moisture in the showers.  *Id.*

Most of the evidence cited by Mr. Montoya concerns mold in the jail.  Mr. Montoya does not present evidence that the mold problem recurred by the time he was housed in the jail in March 2011, after the cleaning in late 2010.  The fact that Sheriff Newman ordered a major cleaning of the jail to address the mold problem shows, at least as of a time shortly before the incarceration of Mr. Montoya, that the Sheriff took action to solve the mold problem rather than being deliberately indifferent to that problem.

Even if the mold problem remained at some unknown level in early 2011, a

medical expert for Mr. Montoya, Dr. Robert Greifinger, testified that he does not know of any association between mold and one of the serious illnesses Mr. Montoya claims was frequent in the jail, MRSA. *Motion for summary judgment*, Exhibit A-3 (*Greifinger Deposition*), 117:11 - 13. There is no other evidence to support a causal connection between mold and MRSA. At worst, Dr. Greifinger saw only a possible oblique causal connection between the HVAC system in the jail and the illness of Mr. Montoya. Asked if he had an opinion as to what role a failure to clean the HVAC system or to repair the HVAC system had in causing the illness of Mr. Montoya, Dr. Greifinger testified: "I just said that it put him at greater risk of harm. But I – as I testified earlier, I'm not saying that more likely than not that's what happened to him." *Id.*, 127:4 - 11. Dr. Greifinger said the failure to maintain the HVAC system was, however, an example of a systemic avoidance of reducing risk of harm to the prisoners in the jail. *Id.*, 127:13 - 16.

Mr. Montoya cites also the report of an industrial hygienist, Jeff Pothast, who examined evidence of conditions in the jail before and after the cleaning in late 2010. *Response exhibits* [#163] Exhibit 33 [#163-33] (*Pothast Report*). In his report, Mr. Pothast says he examined documents in which conditions in the jail are described. There is no indication that he personally examined the jail at the relevant times. *Id.* In his report, Mr. Pothast opines generally that conditions in the jail "likely contributed to [the] severe illness and ultimate hospitalization" of Mr. Montoya. *Id.*, p. 1.

Mr. Pothast says the mold mitigation in 2010 "did not cure the health hazard" that he says existed in the jail before the cleaning. *Id.*, p. 3. He notes that the HVAC system was not cleaned or repaired and "sources of moisture intrusion have not been repaired to adequately prevent the growth of mold." *Id.* He then opines that "(w)ater intrusion, poor ventilation and standing water lead to fungal growth," which contributes

to poor air quality.  *Id.*, p. 4.  He says "(i)nhalation of elevated concentrations of airborne

fungi present a health hazard," which health hazard "may be manifested as headaches

and respiratory distress/disease as well as systemic disease . . . ."  *Id.*

Addressing the HCJ after the cleaning, Mr. Pothast relies on the general

proposition that water and poor ventilation "lead" to fungal growth, but he does not say

that water and poor ventilation actually led to fungal growth in the HCJ after the cleaning

in late 2010.  *Id.*, p. 4.  He says conditions in the jail likely contributed to the illness of

Mr. Montoya, but the bases for this conclusion are (1) (assumed) elevated

concentrations of airborne fungi present a health hazard; and (2) that hazard "may be

manifested as headaches and respiratory distress/disease."  *Id.*, p. 4.  Mr. Pothhast

does not cite evidence that the HCJ had elevated concentrations of airborne fungi after

the cleaning.  Rather, he speculates that was true because ventilation and water

problems were not addressed.  Even if this speculative perspective is adopted, his

opinion of causation is based only on possibility, not probability.  Elevated

concentrations of airborne fungi, he opines, "may be manifested as" various specified

symptoms and illnesses.  *Id.*  Mr. Pothast does not cite sufficient facts and data on

which these opinions are based.[4]  Ultimately, the opinions about possible elevated

concentrations of airborne fungi and possible health effects are the basis for the broader

opinion that conditions in the jail "likely contributed to [the] severe illness and ultimate

hospitalization" of Mr. Montoya.  *Id.*, p. 1.  Mr. Pothast does not cite sufficient facts and

data for this opinion.  Notably, Mr. Pothast does not state an opinion that elevated

---

[4]  The report of Mr. Pothast [#163-33] does not describe the knowledge, skill, experience, training, or education which may qualify him as an expert witness under Fed. R. Evid. 702.  The report indicates that he is a "Certified Industrial Hygienist."  *Pothast Report*, p. 4.  Assuming that is true, it is far from clear that such a certification qualifies Mr. Pothast to opine about causation of the illness suffered by Mr. Montoya.

concentrations of airborne fungi were, more likely than not, a cause of the specific illnesses suffered by Mr. Montoya – MRSA, pneumonia, and sepsis.

To summarize, the evidence cited by Mr. Montoya is not sufficient to support a conclusion by a reasonable jury that, prior to the incarceration of Mr. Montoya, Sheriff Newman was aware of a mold problem in the jail that presented a serious risk to the health of Mr. Montoya or other inmates, was deliberately indifferent to those conditions, and those conditions were a cause of the illness suffered by Mr. Montoya. Thus, as to the mold issue, this theory of official capacity liability fails for lack of evidence of deliberate indifference and lack of evidence that these alleged conditions were a cause of the illness suffered by Mr. Montoya.

Concerning sanitation in the jail generally, mold aside, Mr. Montoya contends there were persistent staph/MRSA infections in the jail before and after Mr. Montoya became ill, which infections constitute circumstantial evidence that Mr. Montoya likely was afflicted with staph/MRSA because the disease was spread in the jail – a condition which Sheriff Newman failed to address. Mr. Montoya cites an August 4, 2010, letter from several jail staff members to Mr. Garbiso. *Response exhibits* [#163] Exhibit 9 [#163-9] (*Jail Staff Letter*). Along with several other complaints, staff complained in the letter that they are concerned about "numerous cases" or MURSA [*sic*] suffered by inmates." *Id.* Mr. Montoya cites also treatment notes of Dr. Neece concerning other inmates. *Response exhibits* [#163] Exhibit 14 [#163-14] (*Neece Notes*). Some of these notes mention MRSA. All of the notes concern examinations by Dr. Neece after the time when Mr. Montoya was in the jail. *Id.* Mr. Montoya cites also the deposition of Roxanna Hill and the report of an industrial hygienist, Jeff Pothast. *Response exhibits* [#163] Exhibits 32 & 33 [#163-32, #163-33] (*Hill Deposition, Pothast Report*).

This evidence is not sufficient to support a conclusion by a reasonable jury that Sheriff Newman was deliberately indifferent to unsanitary conditions in the jail and that this alleged deliberate indifference was a moving force behind the illness of Mr. Montoya.  First, the deposition of Roxanna Hill contains nothing about MRSA or unsanitary conditions.  Second, for the reasons discussed above, Mr. Pothast does not state a sufficient basis of facts and data for his opinions concerning jail conditions and a causal relationship between those conditions and the illness of Mr. Montoya.  The August 2010, letter from jail staff is some evidence that inmates were infected with MRSA prior to August 2010.  The letter does not, however, provide evidence of particular jail conditions known to and disregarded by Sheriff Newman and tied to MRSA in the jail.  The notes of Dr. Neece all have dates after the incarceration of Mr. Montoya and some of those notes mention MRSA.  These notes do not provide evidence of particular jail conditions known to and disregarded by Sheriff Newman and tied to MRSA in the jail prior to the incarceration of Mr. Montoya.

In short, the evidence cited by Mr. Montoya is not sufficient to support a conclusion by a reasonable jury that, prior to the incarceration of Mr. Montoya, Sheriff Newman was aware of unsanitary conditions and disease in the jail, was deliberately indifferent to those conditions, and those conditions were a cause of the illness suffered by Mr. Montoya.  Thus, as to the disease and unsanitary conditions issue, this theory of official capacity liability fails for lack of evidence of deliberate indifference and lack of evidence that these alleged conditions were a cause of the illness suffered by Mr. Montoya.

In support of his official capacity theory based on an alleged failure to abate unsanitary conditions and disease in the jail, Mr. Montoya does not cite evidence which

would support a finding by a reasonable jury that Sheriff Newman was aware of mold, unsanitary conditions, and/or disease in the jail and he was deliberately indifferent to these conditions.  Mr. Montoya does not cite evidence which would support a finding by a reasonable jury that there was a causal relationship between conditions in the jail after the cleaning and his infection with MRSA or the infection of any other jail inmate with MRSA.  To the extent Mr. Montoya bases his official capacity claim on an alleged failure to abate mold, unsanitary conditions, and disease in the jail, his claim fails for lack of evidence of deliberate indifference and causation.

**(2) Lack of adequate policies and procedures** - Mr. Montoya challenges the lack of HCJ policy in two areas: (a) There are no written policies to guide HCJ officers concerning health care for inmates; and (b) The HCJ does not have any written standards or policies applicable to the provision of health care to inmates by Dr. Neece with whom HJC has no written agreement.

(a) Lack of policy to guide HCJ officers - Sheriff Newman says he told his detention officers that they always should call Dr. Neece if an inmate submits a medical request form.  *Newman Deposition*, 52:23 - 53:19.  However, Sheriff Newman says also he prefers his staff to pass such requests up the chain of command to the highest ranking officer to make the decision.  *Id.*, 70:6 - 72:23.  Other evidence indicates this latter procedure was in effect when Mr. Montoya asked to see a doctor.  Routinely, Mr. Montoya was told he could see a doctor only if Mr. Garbiso approved.  One or more HCJ officers say that was the expected procedure.  In essence, Sheriff Newman seems to have expected high ranking HCJ officers to rely on their common sense to assess the need for medical care and its urgency.

Viewed in the light most favorable to Mr. Montoya, the evidence in the record

supports the contention that the HCJ policy requiring Mr. Garbiso or another high ranking officer to approve a visit with Dr. Neece was a cause in fact of at least a two day delay in providing Mr. Montoya needed medical care.  The evidence supports the claim of Mr. Montoya that Mr. Garbiso knew Mr. Montoya needed medical care as of March 7, and possibly earlier.  However, Mr. Montoya did not see Dr. Neece until March 9.

The key question is whether this policy or practice was maintained by Sheriff Newman with deliberate indifference to a known or obvious risk that medical care for serious medical needs of inmates would be delayed or denied.  With some regularity, Dr. Neece examined inmates in the jail.  On its face, that fact demonstrates the provision of medical care, not the denial of medical care.  The policy or practice of delegating the assessment of the need to see a doctor to an experienced officer does not, by itself, bear an obvious risk that medical care will be delayed or denied.  Rather, any delay or denial comes only through the exercise of the judgment of the high ranking officer – which judgment may be good or bad.  There is no evidence of repeated exercise of bad judgment by HCJ officers, including Mr. Garbiso, to whom this task was assigned.  There is no evidence that Sheriff Newman was aware that this policy presented a risk that he disregarded.  Based on lack of proof of deliberate indifference by Sheriff Newman, this theory of official capacity liability fails.

(b) Lack of written guidelines or policies to ensure basic medical care by Dr. Neece - Sheriff Newman did not establish any written guidelines or policies to ensure Dr. Neece provided any basic level or scope of medical care.  It appears Sheriff Newman and Dr. Neece have different perceptions of the duties of Dr. Neece concerning the treatment of HCJ inmates.  Sheriff Newman believes that if Dr. Neece examines an inmate and determines the inmate needs treatment, Dr. Neece is

responsible for providing treatment. *Newman Deposition*, 49:3 - 9.[5]  In contrast, Mr. Montoya asserts, Dr. Neece says he does not have a duty to fulfill the jail's obligation to provide for the medical needs of an inmate.  After seeing an inmate, Dr. Neece generally did not give directions to jail staff about if or when Dr. Neece should be called back about that inmate. That determination was left to jail staff.  *Neece Deposition*, 41:7 - 16.  Mr. Montoya says he told Dr. Neece, at his March 9th meeting with Dr. Neece, that he (Montoya) needed to go to the hospital.  Dr. Neece responded "that is up to the sheriff's, county, whatever, jailers." *Montoya Deposition*, 61:11 - 13.

According to Mr. Montoya, written standards, including an agreement with Dr. Neece defining his duties, and a requirement of proper follow-up care are necessary to provide adequate medical care to inmates.  The lack of such standards and requirements, Mr. Montoya asserts, contributed to the lack of diagnosis and delayed care suffered by Mr. Montoya.  Mr. Montoya claims the assessment of Mr. Montoya by Dr. Neece late on March 9 was seriously flawed.  Mr. Montoya says his symptoms at that time indicated a need for a more thorough examination and hospitalization.  The flawed examination of Dr. Neece, Mr. Montoya contends, was caused by the failure of Sheriff Newman to develop standards and requirements to guide the care provided by Dr. Neece.

Delegation to Dr. Neece of the duty to examine and recommend treatment for ill inmates does not, on its face, present an obvious risk that inmates will be denied adequate medical care.  Rather, delegation of medical care to a licensed physician, a professional with substantial specialized training and regulatory oversight, is, without

---

[5]  Mr. Montoya cites *Newman Deposition*, 47:9 - 13 in support of this statement.  However, page 47 of Sheriff Newman's deposition is not included in the exhibits provided in support of the response [#162 & #163] of Mr. Montoya.

more, quite reasonable.  Dr. Greifinger, a medical expert for the plaintiff, agrees with the proposition that in a small jail, it is reasonable to have a physician to come to the jail on an as needed basis.  *Motion for summary judgment* [#79], Exhibit A-3 (*Greifinger Deposition*), 132:17 - 20.  Nothing in the record shows that this delegation to Dr. Neece had, in the past, led to a pattern of deprivation of medical care to HCJ inmates.  Sheriff Newman says he perceived Dr. Neece to be responsible for providing treatment when he sees an inmate who needs treatment.  That understanding tends to show that Sheriff Newman perceived the delegation of treatment to Dr. Neece as a means to provide treatment, and not a system that was very likely to deny treatment.  This reasonable understanding of Sheriff Newman undermines the contention of Mr. Montoya that the delegation of treatment to Dr. Neece shows deliberate indifference by Sheriff Newman.  There is no evidence that Sheriff Newman knew of Dr. Neece's perception that Dr. Neece was not responsible for providing treatment.

In short, there is no evidence that the lack of written standards applicable to Dr. Neece was known by Sheriff Newman to present an obvious risk that inmates would be denied care for their serious medical needs.  There is no evidence that Sheriff Newman disregarded such a risk.  Based on this lack of proof of deliberate indifference, this theory of official capacity liability fails.

**(3) Failure to hire adequate medical staff or adequately to train existing staff to detect and manage serious medical needs** - Sheriff Newman did not hire anyone with medical training to be available at the jail to address day to day inmate medical issues.  Rather, Dr. Neece is the only individual medical professional used by the jail to address medical issues.  In addition, jail staff have testified that they can and have called an ambulance to obtain care for an inmate at the local hospital.  Given this

arrangement, Mr. Montoya contends, Sheriff Newman should have hired medical staff or provided some medical training to jail employees to enable them to recognize circumstances requiring medical care, including urgent medical care.  The only medical training provided to HCJ officers was CPR and first aid.

(a) Failure to hire medical staff - Mr. Montoya relies primarily on **Garcia v. Salt Lake Cnty.**, 768 F.2d 303, 308 (10th Cir. 1985) in support of this theory.  In **Garcia**, an unconscious Garcia was admitted to the jail after a doctor at a hospital approved his admission to the jail.  The doctor gave his approval only after being assured that the inmate could be medically monitored at the jail.  **Id**. at 305.  After Garcia arrived at the jail, a jail medic directed that Garcia be checked every 15 - 20 minutes.  **Id**.  He was checked about every 30 minutes.  About six hours later, Garcia appeared to be dead, and he later died.  Unknown to all but Garcia, he had ingested an overdose of barbiturate before he was admitted to the jail.

The **Garcia** court held that Salt Lake County properly was held liable for Garcia's death on a municipal liability theory.  Usually, no physician was present at the jail.  Rather, a physician visited three days per week for two hours.  A nurse was at the jail four to five days a week.  A medical technician was on duty every day from 5 a.m. to 9 p.m.  The jail housed as many as 400 inmates.  Given the practice of admitting  inmates who are unconscious and suspected of being intoxicated, the court found that the above-described medical staffing was sufficient evidence of "gross deficiencies and deliberate indifference in staffing and procedures" needed to monitor such inmates.  **Id**. at 308.

Mr. Montoya's situation differs significantly from **Garcia**.  First, the HCJ is much smaller.  The HCJ has a maximum capacity of 32 inmates.  Second, Mr. Montoya's

situation does not involve treatment of an unconscious and possibly intoxicated inmate. Rather, Mr. Montoya's situation involves the progression of what ultimately became a very serious illness.  Given the size of the HCJ and the availability of Dr. Neece and the local hospital, failure to have formally trained medical personnel employed by the jail is not a policy that presents an obvious risk to inmate health.  Dr. Greifinger, a medical expert for the plaintiff, agrees it would not be cost effective to maintain a physician on site in a small jail and that, instead, it is reasonable to have a physician to come to the jail on an as needed basis.  *Motion for summary judgment* [#79], Exhibit A-3 (*Greifinger Deposition*), 132:11 - 20.   There is no evidence that Sheriff Newman perceived such a risk or that he disregarded such a risk.  Based on a lack of proof of deliberate indifference, this theory of official capacity liability fails.

(b) Inadequate training - In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  However, "(a) municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  ***Connick v. Thompson***, ___ U.S. ___, ___, 131 S.Ct. 1350, 1359 (2011).  Under § 1983, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact.  Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.  ***Id.***, ___ U.S. ___, ___, 131 S.Ct. at 1359 - 60.  To establish a failure to train claim, Mr. Montoya must show: (1) training was inadequate; (2) Sheriff Newman was deliberately indifferent in adopting his no training policy; and (3) inadequate training directly caused the constitutional deprivations in question.  ***See Morris v. Dallas County***, 960

F.Supp.2d 665, 685 (N.D.Tex. 2013) (citing cases); **Connick** 131 S.Ct. at 1359

(deliberate indifference required); **Olsen v. Layton Hills Mall** , 312 F.3d 1304, 1318

(10th Cir. 2002) (requirements for failure to train claim).

Most often, failure to train claims are based on a pattern of incidents in which

citizens were injured. **See Connick**, ___ U.S. ___, ___,  131 S.Ct. at 1360.  When city

policymakers are on actual or constructive notice that a particular omission in their

training program causes city employees to violate the constitutional rights of citizens,

the city may be deemed deliberately indifferent if the policymakers choose to retain that

program. A policy of inaction in light of notice that its program will cause constitutional

violations "is the functional equivalent of a decision by the city itself to violate the

Constitution." **Connick**, ___ U.S. ___, ___, 131 S.Ct. at 1360 (internal quotation and

citation omitted).  Continued adherence to an approach that the policymaker knows or

should know has failed to prevent constitutionally tortious conduct by employees may

establish the conscious disregard for the consequences of their action—the 'deliberate

indifference'—necessary to trigger municipal liability.  **Id**.

In a narrow range of circumstances, a pattern of similar violations might not be

necessary to show deliberate indifference.  **Id**. at ___, 131 S.Ct. at 1361.  In **City of**

**Canton, Ohio v. Harris**, 489 U.S. 378 (1989), the Court did not foreclose the possibility

that evidence of a single violation of federal rights, accompanied by a showing that a

municipality has failed to train its employees to handle recurring situations presenting an

obvious potential for such a violation, could trigger municipal liability.  **Board of County**

**Com'rs of Bryan County, Okl. v. Brown** , 520 U.S. 397, 409 (1997).

> (A) violation of federal rights may be a highly predictable consequence of
> a failure to equip law enforcement officers with specific tools to handle

> recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable.

*Id*. at 409 - 410.  The single incident exception is extremely narrow.  A "plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation."  *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010).

Mr. Montoya cites *Morris v. Dallas County*, 960 F.Supp.2d 665, 685 (N.D.Tex. 2013) as persuasive authority.  In *Morris*, jail guards were the link between inmates and jail employees trained to make medical assessments and to provide medical care. Guards were left to monitor inmates, determine potential medical needs, and forward information to health care staff.  *Morris*, 960 F.Supp.2d at 688.  The plaintiff, Morris, was admitted to the jail suffering from alcohol withdrawal and some physical injures.  He was examined several times by medically trained jail employees and was placed in the infirmary in a tank which housed eight to sixteen inmates.  After his last examination by a nurse, a guard saw Morris lying on the floor of the tank.  No policy required the guards to check on Morris's condition at any particular interval and no guard checked on Morris when he was seen lying on the floor.  Guards ignored intercom calls from other inmates in the tank.  A short time later, staff found Morris turning blue and with no pulse after another inmate raised their attention by banging on the door to the tank.  Morris died of pneumonia tied to his alcoholism.

In *Morris*, the plaintiff did not present evidence of past similar incidents that would show a pattern of similar constitutional injuries in the jail.  Other than a CPR course, the guards had no training to look for or be aware of symptoms of illness and how to assess the need for medical care.  The sheriff said she was against providing such training.  The *Morris* court concluded that the evidence presented fact questions on three issues: (1) whether giving no training on medical assessment was inadequate in relation to the tasks guards must perform; (2) whether the plaintiff's injury was a predictable consequence of the absence of training; and (3) whether the failure to train was a moving force behind the alleged constitutional violation and injury. *Morris*, 960 F.Supp.2d at 688.

Mr. Montoya cites also *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1309 (10th Cir. 2002).  The *Olsen* court considered lack of training of county jail booking officers concerning obsessive compulsive disorder.  "Given the frequency of the disorder, Davis County's scant procedures on dealing with mental illness and the prebooking officers' apparent ignorance to [the plaintiff's] requests for medication, a violation of federal rights is quite possibly a plainly obvious consequence of Davis County's failure to train its prebooking officers to address the symptoms." *Id*. at 1320 (internal quotation and citation omitted).

At the HCJ, jail officers often relayed requests for an examination by a doctor to the highest ranking jail officer.  The highest ranking officer made a determination of whether an exam would be provided.  None of the HCJ officers, including the high ranking officers, had any medical training other than CPR and first aid.  Because there is only thin evidence of past denials of medical care to other inmates at HCJ, Mr. Montoya must rely on a single incident theory –  a contention that a highly predictable

consequence of the failure to train was the delay or denial of medical care to an acutely ill inmate. *See Response* [#162], p. 31.

Based on the evidence in the record, this basis for official capacity liability presents two issues: (1) Was the delay or denial of medical care to an acutely ill inmate a highly predictable – or obvious – consequence of the failure to train?; and (2) Is there evidence that Sheriff Newman was aware of this risk – or that the risk was quite obvious – and he chose to disregard that risk?

The first question can be answered yes only if one attributes to jail officers little ability to make an assessment of a need for medical treatment. Generally, HCJ employees say, they rely on common sense in assessing whether a doctor or ambulance is necessary for an inmate. Reliance on such common sense does present some risk that a medical assessment will be inaccurate. However, reliance on common sense does not present an obvious risk of an inaccurate assessment of the serious medical needs of an inmate. To the extent the ***Morris*** court reached a different conclusion, I must respectfully disagree. If the risk was not obvious, then question one can be answered yes only if Sheriff Newman perceived a risk that an improper assessment by guards would lead to the delay or denial of necessary treatment to an inmate. Nothing in the record indicates that Sheriff Newman perceived such a risk. Absent an obvious risk or a perception of risk by Sheriff Newman, there is no basis to find that Sheriff Newman chose to disregard such a risk. Based on a lack of proof of deliberate indifference, this theory of official capacity liability fails.

**(4) Lack of adequate medical equipment and supplies** - When he comes to the jail to see an inmate, Dr. Neece brings only a blood pressure cuff, a thermometer, and a stethoscope. *Response exhibits* [#163], Exhibit 19 [#163-19] (*Bumgarner Depo*),

50:11 - 18.  The jail exam room is a small room with a bed, a filing cabinet, a light, and one other cabinet.  *Id.*, 51:22 - 52:6.  The jail provides no medical supplies for use by Dr. Neece.  The jail does not supply Dr. Neece with needles, cotton balls, or tongue depressors.  The jail does not contract with a lab to test inmate blood or to look for disease.  This lack of supplies and resources, Mr. Montoya argues, fed into Dr. Neece's indifference to Mr. Montoya's condition and his failure to arrange proper treatment for Mr. Montoya.  This, Mr. Montoya contends, was a moving force behind the inadequate examination and treatment of Dr. Neece.

There is no indication that Dr. Neece felt he had inadequate equipment or supplies when he examined Mr. Montoya.  There is no evidence that lack of supplies was the cause in fact or moving force behind Mr. Montoya's injuries because there is no evidence that more abundant supplies would have enabled a proper assessment by Dr. Neece.  There is no evidence that, in the past, inadequate equipment or supplies caused a delay or denial of medical care to another HCJ inmate.  Jail employees testified that, on occasion, they called an ambulance for an inmate and that they relied on Dr. Neece and the local hospital as resources to provide medical care.  With those resources available, the lack of supplies in the room where jail medical assessments were made by Dr. Neece does not present an obvious risk.  There is no evidence that Sheriff Newman was aware of a risk presented by a lack of supplies and equipment and no evidence that he deliberately disregarded that risk.  Based on the lack of evidence showing that a lack of supplies and equipment was a cause in fact of Mr. Montoya's injuries and a lack of proof of deliberate indifference by Sheriff Newman, this theory of official capacity liability fails.

**(5) Failure to maintain and make available adequate medical records** - The HCJ does not maintain inmate medical files.  Dr. Neece is known to create and maintain only his notes from his observations when he comes to see an inmate.  He does not maintain medical histories, medication records, or medical intake sheets.   The HCJ had no standard practice or policy regarding record keeping of medical inmate kites or pill count documents maintained by officers who distributed medications.  In the evidence spoliation hearing, Sheriff Newman testified that record keeping by the HCJ has been "a big mess."  Inmate medical request kites, including those of Mr. Montoya, were not made available to Dr. Neece when he came to the jail to examine an inmate.

In the case of Mr. Montoya, lack of medical records can be seen as a cause of the delay or denial of medical care only if the assessment of Dr. Neece would have been different had the jail provided Mr. Montoya's records to Dr. Neece.  There is no evidence to support that proposition.  Mr. Montoya says he told Dr. Neece of all of his symptoms and recent history.  There is no indication that the kites or other jail records of Mr. Montoya contained additional relevant information not relayed to Dr. Neece by Mr. Montoya.  In addition, absent some history of past incidents involving medical records, the lax medical record policies cannot be said to present an obvious risk to inmate health care.  Further, there is no evidence that Sheriff Newman was aware of such a risk presented by the absence of medical records and no evidence that he deliberately disregarded that risk.  There is no evidence that the failure of the HCJ to maintain medical records and relay those records to Dr. Neece was a cause in fact of or a moving force behind the injuries of Mr. Montoya.  In addition, there is no evidence that Sheriff Newan exhibited deliberate indifference to such a risk.  Thus, this theory of official capacity liability fails.

**(6) Permitting detention staff to distribute medication** - Mr. Montoya
contends that the HCJ policy of permitting jail staff to obtain prescription medications
from the pharmacy and then to distribute those medication to inmates presents an
obvious risk to inmate health.  According to Mr. Montoya, jail staff do not know the
purpose of the medication, and they have no dosing instructions other than,
presumably, those given with the prescribed medicine.  HCJ staff routinely obtains and
dispenses prescription medication to inmates.  Often, prescribed medication is not
picked up by staff and distributed until a day or two after the prescription has been
called in.  While he was in the HCJ, Mr. Montoya did not get any of the medication
prescribed by Dr. Neece late in the day on March 9.  There is no indication that Dr.
Neece directed that the prescription be given to Montoya on an urgent or semi-urgent
basis.  That medication was given to the officer who transported Mr. Montoya from the
HCJ to Alamosa.

Mr. Montoya appears to claim his injuries would have been lessened had he
been given two or more doses of the medication prescribed by Dr. Neece, but HCJ
procedures prevented this from happening.  *Response* [#162], p. 39.  Dr. Robert
Greifinger, a medical expert for Mr. Montoya, testified that one dose of this medication
would have had very little effect on the illness of Mr. Montoya.  *Response exhibits*
[#163], Exhibit 38 [#163-38] (*Greifinger Deposition*), 153:17 - 24.  The effect of two
doses, Dr. Greifinger opined, would have been "a little bit more than very little."  *Id.*,
153:25 - 154:3.

Although some delay in obtaining prescriptions appears to be built into the HCJ
system, this delay cannot be said to present an obvious risk to inmate health.  Absent
acute circumstances, delayed dosing does not present an obvious risk.  There is no

evidence that delayed prescriptions presented a risk to inmate health.  Having guards

distribute prescribed medication to inmates, presumably according to the instructions on

the prescribed medication, also does not present an obvious risk to inmate health.

Taking prescribed medicine as directed does not present an obvious risk.  Mr. Montoya

complains also that untrained jail guards should not be entrusted with performing

medical follow-up like distributing medication.

There is no evidence that the HCJ prescription distribution policy was a cause in

fact of or a moving force behind the injuries of Mr. Montoya.  There is no evidence that

this policy presented an obvious risk that inmates would be denied care for their serious

medical needs.  There is no evidence that, prior to the illness of Mr. Montoya, the result

of this policy put Sheriff Newman on notice that this policy was likely to cause a denial

of care for the serious medical needs of inmates.  There is no evidence that Sheriff

Newman was aware of a such a risk presented by this policy and he deliberately

disregarded that risk.  Thus, this theory of official capacity liability fails.

### D.  Evidence Spoliation

On July 7, 2015, the magistrate judge ruled on an oral motion of the plaintiff for

sanctions based on alleged spoliation of certain evidence by Sheriff Newman.  The

magistrate judge conducted two days of hearings as well as other proceedings on the

spoliation motion.  Primarily, the spoliation issue involved inmate kites used to request

medical care, including those used by Mr. Montoya to request medical care in March

2011.  Ultimately, the magistrate judge found that Sheriff Newman lost or destroyed

relevant inmate kites.  *Order* [#158], p. 25.  In addition, the magistrate judge found that

those lost or destroyed kites would assist the plaintiff in proving his official capacity

claim because the kites would: (1) identify other inmates who complained of the same

or similar symptoms as Mr. Montoya; and (2) lead to the discovery of other evidence which would show how HCJ officials responded, or failed to respond, to inmate complaints of serious symptoms or illnesses during the applicable time period. *Id.*, p. 15. As a sanction against Sheriff Newman for spoliation of this evidence, the magistrate judge ordered that the "parties shall be permitted to present [at trial] evidence relating to the lost or destroyed kites and to argue whatever inferences they hope the jury will draw." *Id.*, p. 26.[6]

I have considered the theories of official capacity liability asserted by Mr. Montoya without considering the possible role of an argument by Mr. Montoya about inferences to be drawn based on the spoliation of evidence by Sheriff Newman. Now, I assess whether an inference based on spoliation of evidence may save one or more theories of official capacity liability. Specifically, I consider an argument that the jury should infer that the lost or destroyed kites would have provided evidence that: (1) identified other inmates who complained of the same or similar symptoms as Mr. Montoya; and/or (2) lead to the discovery of other evidence which would show how HCJ officials responded, or failed to respond, to inmate complaints of serious symptoms or illnesses during the applicable time period.

It is most important to consider this inference in terms of the one potentially viable official capacity liability theory pled in the complaint and argued in the response [#162] of Mr. Montoya – the alleged failure of Sheriff Newman to abate unsanitary conditions and disease in the jail. As discussed above, absent an adverse inference

---

[6] On July 19, 2015, Mr. Montoya filed a Rule 72(a) objection [#179] to the spoliation order of the magistrate judge. In his objection, Mr. Montoya seeks, *inter alia*, the imposition of a more harsh spoliation sanction. Should a more harsh sanction be imposed, I reserve jurisdiction to re-assess the effect of a spoliation sanction on the evidentiary landscape of the official capacity claim.

from the spoliation of evidence, the evidence in the record is not sufficient otherwise to support this theory of official capacity liability.  The strongest reasonable inference available to Mr. Montoya from the spoliation of evidence is that kites from other inmates used on dates prior to the incarceration of Mr. Montoya would have shown recurring and similar illness in other inmates and, possibly, that HCJ officials failed to respond to these illnesses.   If Mr. Montoya persuaded a jury to make these inferences, then those inferences would provide some support to the claim that Sheriff Newman failed to abate unsanitary conditions and disease in the jail.

The key question is whether such inferences, without other evidence to support this theory of liability, are sufficient on their own to support a conclusion by a reasonable jury that Sheriff Newman knew of and disregarded unsanitary conditions in the jail and disease in the jail, and that this deliberate indifference was a moving force behind the illness suffered by Mr. Montoya.  I find and conclude that such inferences, without more, are not sufficient to support such a conclusion by a reasonable jury.  Rather, I find and conclude a reasonable jury could reach such a conclusion only if it also had some evidence, other than the inference from spoliation, to corroborate the factual contentions supported by the inference.  The inference from spoliation alone is not sufficient to support this theory of official capacity liability.  In the context of an official capacity claim, reliance solely on an inference from spoliation is particularly inappropriate.  This is so because "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees."  ***Board of County Com'rs of Bryan County, Okl. v. Brown***, 520 U.S. 397, 405 (1997).

Addressing the theories of official capacity liability which were not pled or preserved by Mr. Montoya, but which he argues in his response [#162], the same

analysis is applicable.  Absent an inference from the spoliation of evidence, the evidence in the record otherwise is not sufficient to support any of the theories of official capacity liability.  The inference from spoliation alone is not sufficient to support any of these theories of official capacity liability.

E.  Conclusion - Official Capacity Liability

Sheriff Newman is entitled to summary judgment on the official capacity claim. Only one theory of official capacity liability has been pled and preserved by Mr. Montoya.  The evidence in the record is not sufficient to support a finding by a reasonable jury that Sheriff Newman is subject to official capacity liability on that theory. The other theories of official capacity liability asserted by Mr. Montoya in his response [#162] were not pled and preserved by Mr. Montoya.  Rather, they were raised improperly for the first time in his response [#162].  Because these theories of official capacity liability were not pled and preserved, they must be dismissed.  Further, even if these theories had been pled and preserved properly, the evidence in the record does not support a finding by a reasonable jury that Sheriff Newman is subject to official capacity liability on any of these theories.

VI.  COLORADO GOVERNMENTAL IMMUNITY ACT

The defendants argue that the Colorado Governmental Immunity Act (CGIA) bars the negligence claim of Mr. Montoya against the defendants. §24-10-101 to -120, C.R.S.  According to the defendants, this court does not have jurisdiction over the state law negligence claim because the defendants are entitled to immunity under the CGIA.

Under the CGIA, an employee of a public entity is immune from all claims that lie

in tort or could lie in tort, except as otherwise provided in §24-10-106.[7]  Under §24-10-106(1)(b), immunity is waived in an action for injuries resulting from the operation of any correctional facility or jail by a public entity or employee.  However, that waiver "does not apply to claimants who have been convicted of a crime and incarcerated in a correctional facility or jail pursuant to such conviction."  C.R.S. §24-10-106(1.5)(a).  In contrast, waiver of sovereign immunity under  C.R.S. §24-10-106(1) "does apply to claimants who are incarcerated but not yet convicted of the crime for which such claimants are being incarcerated." C.R.S. §24-10-106(1.5)(b).  "Because governmental immunity under the CGIA derogates Colorado's common law, we strictly construe the statute's immunity provisions.  *See Bertrand v. Board of County Comm'rs*, 872 P.2d 223, 227 (Colo.1994).  As a logical corollary, we broadly construe the CGIA provisions that waive immunity in the interest of compensating victims of governmental negligence."  *Springer v. City and County of Denver*, 13 P.3d 794, 798 (Colo. 2000).

The record indicates that prior to March 2011, Mr. Montoya pled guilty to a criminal charge and received a sentence of four months supervised probation.  He was not sentenced to incarceration.  *Response to motion to dismiss* [#20], p. 6.  On or about January 27, 2011, Mr. Montoya was ordered to complete an inpatient residential treatment as part of his terms and conditions of probation. *Motion for summary judgment* [#79], Exhibit A-10 (*Report To the Court/Request for Release*).  On March 3, 2011, Mr. Montoya's probation officer alleged that he had violated the terms of his probation by testing positive for cocaine use.  *Id.*  Mr. Montoya was arrested by the

---

[7]  §24-10-106(1), C.R.S. creates immunity for public entities.  §24-10-105(1), C.R.S. provides that public employees are immune from actions seeking recovery for "injuries arising out of an act or omission occurring during the performance of his or her duties and within the scope of his or her employment . . . except as provided in this article."  The limited immunity defined in §24-10-106 is applicable to public employees.

probation officer on an "Affidavit in Support of Warrantless Arrest." *Id.* At an advisement hearing conducted on March 4, 2011, the court noted that Mr. Montoya was "arrested on a probation arrest." *Reply* [#174], Exhibit A-15 (*March 4, 2011,Transcript*) p. 2. The court asked if the probation department would follow up with a probation complaint. *Id.* The probation officer asked for a five day investigation time and said that after five days "we will either be filing a modification, revocation, or report to the Court regarding the results of the investigation. *Id.* Bond for Mr. Montoya was discussed and the court denied bond. *Id.*, pp. 2 - 4. Mr. Montoya agreed to attend an inpatient treatment program. *Report To the Court/Request for Release*. He was released from jail without the filing of a probation complaint or an adjudication of such a complaint. *Id.*

Applying the CGIA provisions quoted above, the key question is whether Mr. Montoya was incarcerated pursuant to his earlier conviction or was he incarcerated, but not yet convicted, of a probation violation. Absent the alleged probation violation, Mr. Montoya would not have been incarcerated. He was not sentenced to jail or prison on the underlying conviction. The sole reason for his incarceration in March 2011 was the alleged but unadjudicated probation violation. A "probationer so arrested shall have all of the rights afforded by the provisions of this code to persons incarcerated before trial of criminal charges and may be admitted to bail pending probation revocation hearing." §16-11-205, C.R.S.

Focusing on the reason for the incarceration of Mr. Montoya, I conclude that he properly is seen, under the CGIA, as a claimant who was "incarcerated but not yet convicted of the crime for which (he was) being incarcerated." §24-10-106(1.5)(b), C.R.S. In that circumstance, immunity is waived under the CGIA. This construction of

the CGIA is consistent with a broad construction of "the CGIA provisions that waive immunity in the interest of compensating victims of governmental negligence." *Springer v. City and County of Denver*, 13 P.3d 794, 798 (Colo. 2000).[8]  Thus, the motion for summary judgment of the defendants based on the CGIA must be denied.

## VII.  CONCLUSION & ORDERS

Faced with the claim of qualified immunity of Mr. Garbiso, Mr. Montoya has come forward with evidence sufficient to show a constitutional violation by Mr. Garbiso and a violation of clearly established law by Mr. Garbiso.  Therefore, the motion for summary judgment of Mr. Garbiso based on his claim of qualified immunity must be denied.

Only one theory of official capacity liability has been pled and preserved by Mr. Montoya.  The evidence in the record is not sufficient to support a finding by a reasonable jury that Sheriff Newman is subject to official capacity liability on that theory. The other theories of official capacity liability asserted by Mr. Montoya in his response [#162] were not pled and preserved by Mr. Montoya.  Rather, they were raised improperly for the first time in his response [#162].  Because these theories of official capacity liability were not pled and preserved, they must be dismissed.  Further, even if these theories had been pled and preserved properly, the evidence in the record does not support a finding by a reasonable jury that Sheriff Newman is subject to official capacity liability on any of these theories.  Sheriff Newman is entitled to summary judgment on the official capacity claim.

Given the circumstances of the incarceration of Mr. Montoya, the defendants are not entitled to immunity under the CGIA as to the negligence claim of Mr. Montoya.

---

[8]  Addressing a motion to dismiss filed by the defendants and raising this issue, I reached the same conclusion.  *Order* [#53] filed September 11, 2013.

Therefore, the motion for summary judgment on the negligence claim based on CGIA immunity must be denied.

**THEREFORE, IT IS ORDERED** as follows:

1.   That the **County Defendants' Motion for Summary Judgment** [#79], filed March 31, 2014, is denied to the extent defendant Larry Garbiso claims entitlement to qualified immunity;

2.   That the **County Defendants' Motion for Summary Judgment** [#79], filed March 31, 2014, is granted as to the official capacity claim against Bruce Newman, in his official capacity as the Sheriff of Huerfano County; and

3.   That the **County Defendants' Motion for Summary Judgment** [#79], filed March 31, 2014, is denied to the extent the defendants claim immunity under the Colorado Governmental Immunity Act.

Dated July 21, 2015, at Denver, Colorado.

**BY THE COURT:**

Bob Blackburn

Robert E. Blackburn
United States District Judge